RECORD NO. 15-1

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

———————————

WILLIAM CHARLES MORVA,

*Petitioner-Appellant,*

v.

DAVID ZOOK, Warden,
Sussex I State Prison,

*Respondent-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

———————————

**OPENING BRIEF OF PETITIONER-APPELLANT
WILLIAM CHARLES MORVA**

———————————

Jonathan P. Sheldon
SHELDON, FLOOD & HAYWOOD, PLC
10621 Jones Street, Suite 301A
Fairfax, VA 22030-5165
Telephone: (703) 691-8410
E-mail: JSheldon@SFHdefense.com

Teresa Norris
BLUME, NORRIS & FRANKLIN-BEST, LLC
900 Elmwood Avenue, Suite 101
Columbia, SC 29201
Telephone: (803) 765-1044
E-mail: teresa@blumelaw.com

*Counsel for Petitioner-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES .............................................................................1

STATEMENT OF THE CASE........................................................................2

STATEMENT OF FACTS ..............................................................................5

SUMMARY OF ARGUMENT .....................................................................15

STANDARD OF REVIEW ...........................................................................17

ARGUMENT ................................................................................................24

I.    The state court violated Morva's rights under the Eighth and Fourteenth Amendments by denying Morva the assistance of a "Risk Assessment Expert" on the issue of future dangerousness ......................24

II.   Trial counsel was ineffective in stipulating that Morva was a prisoner imprisoned and in "lawful custody" on August 20 and August 21.........35

III.  Trial counsel was ineffective for failing to conduct an adequate investigation into Morva's background, history, character, and mental illness; failing to provide the available information to the mental health experts in order to ensure an accurate and reliable mental health evaluation; and failing to adequately present all the available mitigating evidence in sentencing ...........................................................44

      A.  Counsel's conduct was deficient and not based on any reasonable strategy .......................................................................47

      B.  Morva was prejudiced by trial counsel's deficient conduct ..........68

      C.  The state court's adjudication .......................................................79

i

D.    The District Court's Holding ........................................................82

CONCLUSION .................................................................................................89

REQUEST FOR ORAL ARGUMENT ....................................................................89

CERTIFICATE OF COMPLIANCE.......................................................................90

CERTIFICATE OF SERVICE ..............................................................................91

# TABLE OF AUTHORITIES

## CASES

*Bell v. Cone*,
535 U.S. 685 (2002)........................................................................18

*Boyde v. California*,
94 U.S. 370 (1990)..........................................................................79

*Brown v. Commonwealth*,
733 S.E.2d 638 (Va. 2012) ........................................................38, 39

*Brown v. Lukhard*,
330 S.E.2d 84 (Va. 1985))...............................................................39

*Brumfield v. Cain*,
135 S. Ct. 2269 (2015).....................................................................21

*Burns v. Commonwealth*,
541 S.E.2d 872 (Va. 2001) ..........................................................8, 26

*Coble v. State*,
330 S.W.3d 253 (Tex. Crim. App. 2010) .........................................30

*Coleman v. Thompson*,
501 U.S. 722 (1991)...................................................................22, 23

*Crane v. Kentucky*,
476 U.S. 683 (1986).........................................................................29

*Move site    Lee v. Clarke*,
781 F.3d 114 (4th Cir. 2015) ...........................................................21

*Eddings v. Oklahoma*,
455 U.S. 104 (1982).........................................................16, 26 29 34

*Edwards v. Carpenter*,
529 U.S. 446 (2000).........................................................................23

*Elmore v. Ozmint*,
    661 F.3d 783 (4th Cir. 2011) ..........................................................46

*Florida v. Nixon*,
    543 U.S. 175 (2004) ........................................................................44

*Ford v. Wainwright*,
    477 U.S. 399 (1986) ............................................................20, 21, 82

*Gardner v. Florida*,
    430 U.S. 349 (1977)) ................................................................26, 32

*Graves v. Cockrell*,
    351 F.3d 143 (5th Cir. 2003) ........................................................22

*Gray v. Branker*,
    529 F.3d 220 (4th Cir. 2008) ..................................................46, 79

*Gray v. Pearson*,
    526 Fed. Appx. 331 (4th Cir. 2013) .............................................23

*Hall v. Washington*,
    106 F.3d 742 (7th Cir. 1997) ........................................................46

*Harrington v. Richter*,
    562 U.S. 86 (2011) ..................................................................19, 29

*Hitchcock v. Dugger*,
    481 U.S. 393 (1987) ................................................................16, 26

*Holmes v. South Carolina*,
    547 U.S. 319 (2006) ......................................................................29

*Howes v. Fields*,
    132 S. Ct. 1181 (2012) ..................................................................18

*Jefferson v. Commonwealth*,
    204 S.E.2d 258 (Va. 1974) ............................................................42

*Juniper v. Davis*,
  137 F.3d 28 (4th Cir. 2013) ...............................................................23

*Kelly v. South Carolina*,
  534 U.S. 246 (2002)...........................................................................27

*Lockett v. Ohio*,
  438 U.S. 586 (1978)...........................................................16, 26, 34, 44, 45

*Lockyer v. Andrade*,
  538 U.S. 63 (2003)..............................................................................18

*Mabe v. Commonwealth*,
  417 S.E.2d 899 (Va. Ct. App. 1992).................................................41

*Martinez v. Ryan*,
  132 S. Ct. 1309 (2012)...................................................................23, 40

*McCarver v. Lee*,
  221 F.3d 583 (4th Cir. 2000) ............................................................65

*McCoy v. United States*,
  266 F.3d 1245 (11th Cir. 2001) ....................................................24, 28

*McKoy v. North Carolina*,
  494 U.S. 433 (1990)...........................................................................28

*Miller-El v. Cockrell*,
  537 U.S. 322 (2003)........................................................................20, 22

*Moore v. Hardee*,
  723 F.3d 488 (4th Cir. 2013) ............................................................21

*Morva v. Commonwealth*,
  683 S.E.2d 553 (Va. 2009) ..........................................................3, 25, 26

*Morva v. Davis*,
  No. 7:13-cv-283 (W.D. Va.)................................................................1

*Morva v. Virginia*,
    562 U.S. 849 (2010)..........................................................................3

*Morva v. Warden*,
    741 S.E.2d 781 (Va. 2013) ................................................5, 80, 81

*Mu'Min v. Commonwealth*,
    389 S.E.2d 886 (Va. 1990) ............................................................42

*Panetti v. Quarterman*,
    551 U.S. 930 (2007)..............................................20, 21, 81, 82, 87

*Porter v. Commonwealth*,
    661 S.E.2d 415 (Va. 2008) ............................................................15

*Porter v. McCollum*,
    558 U.S. 30 (2009)..................................................................45, 82

*Rivera v. Quarterman*,
    505 F.3d 349 (5th Cir. 2007) ........................................................82

*Rojem v. State*,
    207 P.3d 385 (Okla. Crim. App. 2009) .........................................30

*Rompilla*,
    554 Pa. 385, 721 A.2d 786 (1998)................................................89

*Rompilla v. Beard*,
    545 U.S. 374 (2005)................................................46, 58, 86, 88

*Ruffin v. Commonwealth*,
    62 Va. 790 (1872) .......................................................................42

*S.Q. v. St. Anthony Reg'l Hospital*,
    805 N.W.2d 397 (Iowa Ct. App. 2011) .........................................43

*Sears v. Upton*,
    561 U.S. 945 (2010)..........................................................45, 69, 83

*Sell v. United States*,
539 U.S. 166 (2003)........................................................................78

*Shafer v. South Carolina*,
532 U.S. 36 (2001)..........................................................................27

*Simmons v. Commonwealth*,
431 S.E.2d 335 (Va. Ct. App. 1993)...............................................42

*Simmons v. South Carolina*,
512 U.S. 154 (1994)................................................ 216, 27, 28, 30, 31, 32, 42

*Skipper v. South Carolina*,
476 U.S. 1 (1986)..................................................................16, 17, 27, 29, 47

*Smith v. Mullin*,
379 F.3d 919 (10th Cir. 2004) ........................................................44

*State v. Douglas*,
800 P.2d 288 (Or. 1990) .................................................................30

*Stewart v. Secretary, Florida Department of Corrections*,
355 Fed. Appx. 275 (11th Cir. 2009) .............................................24

*Strickland v. Washington*,
466 U.S. 668 (1984)................................................ 39, 46, 65, 68, 80, 82, 85

*Taylor v. Maddox*,
366 F.3d 992 (9th Cir.2004) .........................................................21

*Tennard v. Dretke*,
542 U.S. 274 (2004).................................................................29, 45

*Trevino v. Thaler*,
133 S. Ct. 1911 (2013)...................................................................23

*United States v. Campos-Serrano*,
404 U.S. 293 (1971)........................................................................39

*United States v. Lanier*,
  520 U.S. 259 (1997).......................................................................39

*White v. Commonwealth*,
  591 S.E.2d 662 (Va. 2004) ...........................................................36

*White v. Roper*,
  416 F.3d 728 (8th Cir. 2005) ........................................................86

*Wiggins v. Smith*,
  539 U.S. 510 (2003)...........................................45, 46, 69, 85, 86

*Wiley v. Epps*,
  625 F.3d 199 (5th Cir. 2010) ........................................................82

*Williams [Terry] v. Taylor*,
  529 U.S. 362 (2000)................................................18, 19, 45, 69

*Winston v. Pearson*,
  683 F.3d 489 (4th Cir. 2012) ............................................23, 40 45

*Wolfe v. Clarke*,
  691 F.3d 410 (4th Cir. 2012) ........................................................21

*Wood v. Cox*,
  333 F. Supp. 1064 (W.D. Va. 1971).............................................42

*Woodson v. North Carolina*,
  428 U.S. 280 (1976)...............................................................44, 45

*Yarborough v. Alvarado*,
  541 U.S. 652 (2004).............................................................19, 29

## STATUTES AND CODES

28 U.S.C. § 1291 ...............................................................................1
28 U.S.C. § 2241 ...............................................................................1
28 U.S.C. § 2253 ...............................................................................1
28 U.S.C. § 2253(c) ....................................................................21, 22
28 U.S.C. § 2254 .............................................................................21

28 U.S.C. § 2254(b)(1)(A) ...........................................................22
28 U.S.C. § 2254(d) ..................................................18, 20, 31
28 U.S.C. § 2254(d)(1) ...............................................18, 20
28 U.S.C. § 2254(d)(2) ...............................................19, 20
28 U.S.C. § 2254(e)(1) ...............................................19, 20

Cal. Pen. Code § 190.2(a)(5) ....................................37
Del. C. § 4209 (e)(1)(a) .............................................37
Idaho Code § 19-2515(9) ..........................................36
Kan. Stat. Ann. § 21-4636 ........................................37
Kentucky KRS § 532.025 ..........................................36
La. R.S. § 14:30(A)(1) ..............................................37
Mont. Code Ann. § 46-18-303 ..................................37
Neb. § 29-2523 .........................................................36
NH RSA 630:5 (vii)(J) ..............................................37
O.C.G.A. § 17-10-30(b)(9) ........................................36
S.C. Code. Ann. § 16-3-20(C) ...................................36
S.D. Stat. Ann. § 23A-27A-1(8) ................................37
Tenn. Code Ann. § 39-13-204(i)(8) ............................38
Tex. Penal Code § 19.03(a)(4) ...................................37
Va. Code § 18.2-31 ....................................................35
Va. Code § 18.2-31(3) ...............................2, 16, 35, 38
Va. Code § 18.2-31(6) ..................................................2
Va. Code § 18.2-31(8) ..................................................2
Va. Code § 19.2-264.2 ..................................................6

## RULES

Fed. R. App. P. 4(a)(1) ..................................................1
Local R. 22(a)(2)(B) .....................................................1

## CONSTITUTION

Const. amend. VI ....................................................45, 65
Const. amend VIII........................................................24
Const. amend XIV.............................................24, 45, 65

## OTHER AUTHORITIES

Alistair Munro, Delusional Disorder 72 (1999) ................................74, 75, 77, 78K

American Bar Association Guidelines for the Appointment and
Performance of Counsel in Death Penalty Cases Guideline 11.4.I(C) (1989) ........46

Bruce J. Cohen, Theory and Practice of Psychiatry (2003) ...................................73

DSM-IV-TR § 297.1 ...........................................................................73, 74, 75, 77

*The Relationship Between Delusions and Violence*, Coid et al, JAMA
Psychiatry 2013;70(5) ...............................................................................................79

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over Morva's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241. This Court has jurisdiction over this appeal under 28 U.S.C. §§ 1291, 2253. The district court's judgment became final on April 15, 2015, when it granted the Warden's motion to dismiss Morva's petition for writ of habeas corpus. *Morva v. Davis*, No. 7:13-cv-283 (W.D. Va.) reprinted at JA-2966[1] (opinion), JA-3069 (final order). On May 13, 2015, Morva timely appealed from this final order under Fed. R. App. P. 4(a)(1). JA-3069A.

# STATEMENT OF ISSUES

The district court granted Morva a Certificate of Appealability ("COA") on one issue:

> (1) Whether the state court's denial of the assistance of a risk assessment expert on the issue of future dangerousness violated Morva's rights under the 8th and 14th Amendments. JA-2999-3000 n.17.

Morva also seeks a COA, pursuant to Local Rule 22(a)(2)(B), on two other issues:

> (2) Whether trial counsel was ineffective for agreeing to stipulate that Morva was a prisoner Imprisoned and in "Lawful Custody" on August 20 and August 21.

> (3) Whether trial counsel was ineffective for failing to conduct an adequate investigation into Morva's background, history, character, and mental illness; failing to provide the available information to the mental health experts in order to ensure an accurate and reliable mental health evaluation;

---

[1] "JA" refers to the joint appendix.

1

and failing to adequately present all the available mitigating evidence in sentencing.

## STATEMENT OF THE CASE

William Morva, was charged in Montgomery County Circuit Court with three counts of capital murder in violation of Virginia Code Sections, 18.2-31(3), (6) and (8), assaulting a law enforcement officer, escape, and two counts of use of a firearm in the commission of murder. JA-14-16, 52-55. The trial court granted Morva's motion for change of venue and the case was moved to Washington County Circuit Court. JA-180-81. After opening arguments, the trial court read the following stipulation:

> The first evidence which you are to consider . . . is a stipulation of fact . . . which has been reached by both the Commonwealth and the defense. That statement is as follows . . . that on the dates in question for the crimes charged, that is August 20th and August 21st of 2006, that the Defendant was a prisoner in a state or local correctional facility. That the Defendant was imprisoned, but not yet had gone to trial on the criminal offenses, and that the Defendant was in lawful custody.

JA-282-83. At the conclusion of the evidence in the trial, the Court instructed the jury:

> No. 17. The Defendant is charged with the crime of capital murder. The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime: . . . and Number 3) that the killing was committed while the Defendant was a prisoner confined in a local correctional facility or while in the custody of an employee thereof.
>
> . . . . No. 21. The Defendant is charged with the crime of

2

escape.  The Commonwealth must prove beyond a reasonable doubt each of the following elements of that crime:  Number 1) that the Defendant was lawfully imprisoned in jail awaiting trial on a criminal offense or was lawfully in the custody of any police officer on a charge of a criminal offense; and Number 2) that the Defendant escaped from such confinement or custody by force or violence.

JA-494-98.

The jury convicted Morva as charged.  JA-501-03.  During sentencing, the court refused to allow Morva to present testimony to the jury from an expert on prison risk assessment, prison violence, and security.

The jury reached its verdict and fixed Morva's punishment at death three times for each charge of capital murder.  JA-909-14.  On June 23, 2008, the court imposed the jury's recommended sentences.  JA-949-51.

On direct appeal, Morva asserted, *inter alia*, that "the trial court erred in denying the Defendant's Motion for Appointment of Expert on Prison Risk Assessment (specifically Mark D. Cunningham, PH.D., ABPP) and to Introduce Evidence on Prison Violence and Security."

The Supreme Court of Virginia affirmed the judgment.  *Morva v. Commonwealth*, 683 S.E.2d 553 (Va. 2009) reprinted at JA-980A.  Two of the seven justices dissented and would have reversed the judgment of the circuit court.  JA-980N (*Id.* at 568).  Morva's petition for rehearing and petition for writ of certiorari were denied.  *Morva v. Virginia*, 562 U.S. 849 (2010).

Sixty days later, on December 3, 2010, as required by state law, Morva filed

3

a petition for writ of habeas corpus in the Virginia Supreme Court, raising thirteen challenges to his convictions and sentences, including three challenges asserting the ineffective assistance of counsel for failing to adequately investigate and present mitigation evidence.

Morva's state habeas petition included a request for an evidentiary hearing. After he filed the petition, Morva filed several motions for assistance in developing additional evidence to support enumerated claims in his petition. Specifically, he sought: (1) discovery, which included depositions of persons with potentially mitigating information;[2] (2) appointment of one or more mental health experts or for authorization to incur and be reimbursed for the cost of retaining such experts;[3] and (3) an evidentiary hearing.

On April 12, 2013, the Supreme Court of Virginia denied the petition without conducting an evidentiary hearing, without granting Morva leave to engage in any post-conviction discovery, and without funding any investigation or

---

[2] These witnesses included Laura Eichenlaub, who knew Morva prior to his confinement and was the only mental health service provider (a "counselor") who met with Morva in pretrial confinement prior to the shootings of McFarland and Sutphin; and two teachers who observed Morva, were concerned about him, and formed a high school teachers' group whose purpose was to get Morva some help.

[3] The motion for expert assistance was supported by a detailed 55-page affidavit by Dale. G. Watson, Ph.D., based on his review of affidavits and records presented to the state court; and a preliminary report from Leslie Lebowitz, Ph.D., a clinical psychologist with specific expertise in trauma.

experts. *Morva v. Warden*, 741 S.E.2d 781 (Va. 2013) reprinted at JA-2211A.

Morva filed his § 2254 habeas petition in the district court on September 19, 2013. An amended petition, as permitted by the district court, was filed on December 18, 2013, together with a motion to find Morva incompetent, and a motion for discovery. JA-2255-2428; JA-2112-2136. ECF 57-59. Morva filed a hand-written *pro-se* petition. JA-2429. The Warden moved to dismissed Morva's counseled petition. JA-2451. Morva filed a second amended petition addressing only claim IX. JA-2635. The Warden again moved to dismiss. JA-2949. On April 15, 2015, the district court granted the Warden's motion to dismiss. JA-2966.

## STATEMENT OF FACTS

Morva had been an inmate at the Montgomery County Jail for approximately one year, when in the early morning hours of August 20, 2006, he was injured and transported to a hospital emergency room by Deputy Russell Quesenberry. JA-286-89. After he was x-rayed and treated, Morva asked Quesenberry if he could use the hospital bathroom and Quesenberry consented. JA-291, 299. When Quesenberry checked on Morva, Morva attacked him, rendered him unconscious, took his service revolver, and left the restroom. As Morva walked down a hospital hallway toward the exit, he encountered and fatally shot Derrick McFarland, an unarmed hospital security guard. JA-298, 306-14, 346. Morva then ran through

the emergency room and fired shots into the glass doors leading outside in order to exit the hospital.  JA-319-26.  A large scale search for Morva ensued that lasted through August 20 and into August 21, 2006.  Ultimately, the search focused on "The Huckleberry Trail," a paved walking and biking trail that runs from Blacksburg to Christiansburg, Virginia.  Montgomery County Sheriff's Corporal Eric Sutphin, who was participating in the search, discovered Morva near the Trail on the morning of August 21, and Morva fatally shot him.  JA-362-400, 401-10. Officers ultimately found Morva hiding in a thicket near the trail.  JA-436-46. Morva stated after his arrest that he did not mean to hurt anybody, JA-453-54, and "I did not mean to hurt your friend," JA-459-60.

Early in the proceedings in the circuit court, the Commonwealth notified Morva's counsel that it would seek the death penalty in accord with the provisions of Code § 19.2-264.2, which provides the aggravating factors of future dangerousness or vileness so as to make a defendant convicted of capital murder in Virginia eligible for the death penalty.  Now knowing that the Commonwealth would rely heavily on the "continuing threat" aggravating factor in order to persuade the jury to sentence Morva to death, Morva moved pretrial for appointment of Dr. Mark D. Cunningham, a forensic psychologist specializing in prison risk assessment, to provide rebuttal testimony on that issue.  JA-70-90. Morva asserted that he required the assistance of a risk assessment expert "to assist

6

the jury in making a reliable assessment of the probability that he will commit criminal acts of violence that would constitute a continuing serious threat to society, and thereby to rebut the government's allegation that the defendant will probably commit such acts unless he is executed." JA-89. The motion emphasized that a scientific risk assessment was especially crucial to Morva's ability to respond to the prosecution's claim that he would pose a continuing threat of serious violence because his case involved a jailbreak and the ensuing killings of two security/law enforcement officers. JA-72-73.

The motion was accompanied by an affidavit from Dr. Cunningham setting forth his qualifications, JA-127-35, and detailing the scientific basis and methodology of the prison violence risk assessment that he proposed to undertake, JA-136-65. Dr. Cunningham's risk assessment methodology included consideration of all relevant facets of Morva's own character, record, and history. JA-156, ¶ 34. To further illustrate this point for the trial judge, Morva also provided a series of demonstrative exhibits summarizing Dr. Cunningham's completed risk assessment testimony in another Virginia case, *Commonwealth v. Jose Rogers* (Stafford, August 24, 2006), in which Dr. Cunningham had been appointed and had testified. JA-107-19. Dr. Cunningham's affidavit explained that the *Rogers* outline was being proffered "to illustrate my anticipated testimony regarding Mr. Morva," and that similar exhibits "would have been particularized to

7

Mr. Morva where applicable, but [that] the methodology and relevant group data would have remained constant." JA-162, ¶ 42. The *Rogers* exhibits listed and evaluated relevant facets of Rogers' record and personal characteristics on the issue of his likely future prison behavior, and so left no doubt as to the individualized nature of Dr. Cunningham's risk assessment methodology. JA-107-11, 116. The trial judge denied Morva's request to appoint Dr. Cunningham on the authority of *Burns v. Commonwealth*, 541 S.E.2d 872 (Va. 2001), which, the court stated, rejected the contention that "an inmate's environment and structure within a maximum security prison is relevant in rebutting evidence of future dangerousness." JA-222, JA-103.

Following a change of venue to Washington County, but before trial commenced, Morva filed a motion for reconsideration, supported by a letter from Dr. Cunningham, that re-emphasized the individualized nature of the expert risk assessment he was requesting. JA-168-79. Dr. Cunningham's letter also included an individualized discussion of what factors had been empirically demonstrated not to consistently predict greater violence risk in a prison setting. These factors included: "(1) the severity of the offense of conviction, (2) past violence in the community, and/or (3) escape history." JA-179. This discussion underscored important (and counterintuitive) research findings referred to in Dr. Cunningham's earlier proffer, including the lack of consistent correlation between the incidence of

8

in-prison violence by a given convicted murderer and such seemingly relevant factors as prior escapes, personality disorders such as Antisocial Personality Disorder, and even the murder of a law enforcement officer. JA-146-47 ¶¶ 17-18, 153 ¶¶ 21-23.

In sum, the original and supplemental proffers informed the trial judge that Morva wished Dr. Cunningham to provide the jury with a detailed scientific risk assessment grounded in the specific facts of his own case, and bringing the insights of empirical research and scientific knowledge to bear on the jury's predictive task. Morva's proffers also included social science data establishing the counter-intuitive fact that convicted murderers and inmates serving life-without-parole sentences are not disproportionately more likely to perpetrate assaults in prison, and have even been found to be disproportionately less likely to be involved in assaultive misconduct in some studies. Finally, the information before the trial judge explained why, in the absence of such expert risk assessment testimony, Morva's jury was very likely to vastly exaggerate the actual likelihood that he would violently reoffend if sentenced to life imprisonment, and to sentence him to death on that erroneous basis. JA-78-79 (citing research showing that capital trial jurors in Texas overestimated future violence and homicide by convicted capital murderers by as much as 100 times). Nevertheless, the trial judge denied the motion for reconsideration after a brief hearing, JA-233-42, and proceeded to trial.

The trial judge's denial of Morva's requested prison violence risk assessment left the prosecution free to base its future dangerousness claim on the very assumptions and misconceptions that Dr. Cunningham's assessment would have rebutted, and during the sentencing hearing, the prosecution took full advantage of its opportunity.  In sum, the Commonwealth presented evidence and invited the jury to decide the "continuing threat" issue on the following assumptions: that Morva's conduct in the free world and in the Montgomery County Jail could be directly extrapolated into the future should he become a life-term prison inmate in the Virginia Department of Corrections ("DOC"); that his record of violence and threats directed at police officers made it probable that he would attack and even kill correctional officers once imprisoned for life; that the proportionately much greater sentence (of life imprisonment) facing Morva would carry with it a proportionate increase in the likelihood of serious violence, including murder, once Morva found himself confined in the Virginia DOC; and, that Morva's intelligence and personality made him especially dangerous.

Building upon the case it made during trial, the Commonwealth argued at sentencing that Morva's history and the details of his crime demonstrated a pattern of behavior that would likely continue if Morva became a life-term prison inmate. JA-658.  The Commonwealth introduced evidence that Morva had committed an attempted robbery and other felony offenses, that he had made remarks about

10

taking children hostage to extort money from a previous employer, JA-510-11, 513, 540-58, and that Morva wrote a letter to his mother after he had been in jail for one month, in which he included the statement, "I will kick an unarmed guard in the neck and make him drop, then I will stomp him until he is as dead as I'll be." JA-461.  On cross-examination of Morva's two expert mitigation witnesses, the Commonwealth elicited testimony that Morva has above average intelligence, lacks empathy for others, and has a narcissistic belief that the normal rules do not apply to him.  JA-838, 846-47.

In his closing argument, the prosecutor invited the jury to infer from Morva's escape that if he was sentenced to life in prison without the possibility of parole, he would escape again and "hurt[] and murder[] people" in doing so.  JA-907.  He also argued that since Morva's victims were in law enforcement, he posed a particular risk of committing additional violent crimes in prison:

> We're talking about a prisoner here who hurts guards, beats them. We're talking about a prisoner who shoots uniformed officers.  Those people are entitled to protection in the world too.  Jail guards, prison guards.  They are part of society and they are at risk from that Defendant without a doubt.  You need look no further than his actions and his words to know that those guards are at risk.

JA-893-94.  The prosecutor reasoned that imposing a life sentence on Morva would render him even more violent:

> If one month causes you to develop the heart and the mind to kill a Jail guard, in one year and it's done, and you're killing people, what is the prospect of life in prison going to cause that person to feel

11

justified in doing to those prison guards?

JA-895-96.  And the prosecutor concluded his argument with a dramatic warning that failing to execute Morva would lead to more violence and murder: "Could there be anything worse, could there be anything worse?  Yes, there could.  One thing.  And that would be if that Defendant ever hurt or killed another person." JA-908.

But Dr. Cunningham's affidavit and letter to the trial judge included summaries of research findings that tend to rebut or disprove many of the inferences the prosecutor urged the jury to draw from Morva's crime and prior history.  Given the trial court's refusal to appoint a risk assessment expert, however, the jury never heard about any of this.

 Norine Pilkins, a captain at the New River Valley Regional Jail where Morva was held in isolation for some 18 months prior to his trial, testified in mitigation that Morva had no disciplinary infractions during the time he spent at the Jail.  JA-734-35.  However, she was not permitted to answer defense counsel's question concerning whether the security conditions under which Morva would serve any life sentence in the Virginia Department of Corrections would be even more restrictive than those at the Jail, JA-736, and the defense was barred by the trial court's pretrial order from presenting any other evidence on this obviously critical point, JA-103, 222, 241, 222, 241.  On the other hand, the Commonwealth

12

was again free to summon up the frightening prospect that Morva would be permitted to escape and kill virtually as he pleased if the jury should be so heedless as to spare his life.  JA-893 (arguing that it was "impossible" for the jury to conclude that Morva would not escape again); JA-907 ("[W]hen he escapes, he hurts people and murders people").  After hearing this argument, the jury imposed three death sentences on each of the three capital counts after finding that the vileness and continuing threat aggravating factors had been proven as to each.  JA-909-14.

Morva also presented the jury with evidence that he suffers from schizotypal personality disorder, which is related to schizophrenia, and that this disorder contributed to the offenses.  Dr. Bruce Cohen, a psychiatrist, testified that due to this disorder, Morva "had a way of seeing the world that one could say is not fully in his control …." JA-823-24.

The Commonwealth used this evidence to argue that the disorder made him more likely to kill in prison.  For example, when Dr. Cohen testified concerning Morva's superior intellectual ability, the prosecutor implied that this attribute would assist Morva in planning additional escapes.  JA-838-39.  After Dr. Cohen described how Morva's schizotypal personality disorder had rendered him unable to appreciate other people's reactions to him or to navigate successfully through life, JA-820-24, the prosecutor reframed the doctor's description of Morva's

13

affliction to portray him as dangerously self-centered, unfeeling, and narcissistic, JA-843-47. Finally, the prosecutor argued that personality disorders like Morva's tend to be of "long duration, inflexible and pervasive," thus extending Morva's supposed dangerousness far into the future. JA-848. The prosecutor also made use of "base rates," inviting the jury to conclude (despite the absence of any supporting evidence) that Morva was malingering the symptoms described by Dr. Cohen, because "the base rate for malingered, or exaggerated psychiatric symptoms, is much higher in forensic psychiatric evaluations like the evaluation that you conducted on the Defendant." JA-827. *See also* JA-773-74 (cross-examining defense neuropsychologist Scott Bender regarding the "base rate" of malingering among criminal defendants). However, due to the court's rejection of Dr. Cunningham's risk assessment testimony, the jury heard only about those base rates that favored the prosecution, and not about the extremely low base rates of serious violence in the Virginia Department of Corrections, *see* JA-114-15 (Rogers evaluation),[4] or that the observed rates of such violence did not increase among life term inmates who had previously escaped or murdered police officers, and actually

---

[4] The official Virginia Department of Corrections data summarized in Dr. Cunningham's *Rogers* proffer revealed, for example, that in FY 2004, roughly 35,000 Virginia inmates (nearly 19,000 of whom were imprisoned for violent offenses) committed a total of *one* inmate-on-inmate homicide, 14 assaults on staff, and one escape. The last homicide of a Virginia DOC staff member by an inmate occurred in 1975. JA-114-15.

declined among more educated inmates.

Prior to imposition of the jury's death verdicts, citing the state court's intervening decision in *Porter v. Commonwealth*, 661 S.E.2d 415, 440-41 (Va. 2008), Morva renewed his objection to the denial of his risk assessment evidence, JA-182-87, 924-38, 927-40, but the trial court again overruled the objection, JA-939, and sentenced Morva to death, JA-950.

## SUMMARY OF ARGUMENT

I.    Morva was denied Dr. Cunningham's assistance as a risk assessment expert, violating two core rights: first, his due process right to rebut allegations of future dangerousness and second, his Eighth Amendment right to present all relevant and mitigating evidence.   The courts below are incorrect that the prosecution neither proposed nor introduced evidence concerning Morva's future dangerousness or prospective life in prison.   They are also incorrect that Dr. Cunningham's prospective testimony was not sufficiently particularized to Morva.

The state court decision is contrary to United States Supreme Court precedent and an unreasonable determination of the facts. First, capital defendants enjoy a federal constitutional right to rebut allegations of future dangerousness, and where state law evidentiary restrictions impinge on that right, the restrictions must yield to "the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to

15

deny or explain.'" *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Simmons v. South Carolina,* 512 U.S. 154 (1994).   And second, relevant mitigating factors are unlimited by well-settled Eighth Amendment law. *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).

II.    The Commonwealth charged Morva with capital murder for killing McFarland in violation of Virginia Code § 18.2-31(3), but this killing did not fit any of the statutory definitions of capital murder.   A necessary element for the capital murder of McFarland in violation of § 18.2-31(3) was that "while being *confined as a prisoner in* a local or state correctional facility . . . or while *in custody of an employee* thereof" Morva killed McFarland. *Id.* (emphasis added). Although Morva's legal status was "prisoner," he clearly was not "confined as a prisoner in" jail when he killed Mr. McFarland.  Equally clearly, Morva was not in the custody of an employee of the jail.  Trial counsel stipulated at trial that Morva was in lawful custody – a fact that was obviously, clearly, demonstrably not true. Thus trial counsel was ineffective for making this stipulation.    State habeas counsel was ineffective in failing to raise this substantial and clearly meritorious ineffective assistance of trial counsel claim, so the procedural default from the failure to raise this issue in state court, is excused.

III.    Under the Sixth and Fourteenth Amendments, Morva's trial counsel

16

conducted an unreasonable and inadequate investigation of Morva's childhood, family background, and mental illness; counsel failed to provide this information to mental health experts in order to ensure an accurate and reliable diagnosis; and counsel failed to adequately present all of the available mitigating evidence in the capital sentencing hearing. The state court decision is entitled to no deference in federal habeas because the state court dismissed this well-pled allegation of the denial of his constitutional rights, despite sharp, material disputes of fact in the evidence proffered by the parties and without an evidentiary hearing, without discovery, and without any funding for Morva to obtain the assistance of experts, based solely on the basis of a written record. The process through which the state court purported to determine facts was arbitrary and unreasonable, as were the "facts" resulting therefore. Even assuming any deference is required, the state court decision was contrary to and an unreasonable application of federal law, as well as an unreasonable determination of the facts in the state court record.

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act (hereinafter "the AEDPA"), a federal court's ability to grant habeas corpus relief is subject to the following limitations:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was not adjudicated on the merits in State court proceedings unless the adjudication of the claim–

17

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(d)'s provisions are disjunctive in character and "have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

"'[C]learly established law'" under § 2254(d)(1) refers to "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions,'" *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012) (quoting *Williams [Terry] v. Taylor*, 529 U.S. 362, 412 (2000)), and may constitute a "series of precedents" establishing "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision," *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A state court's decision is "contrary to" Federal law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 695. Even where that has not occurred, however, relief is still available under the "unreasonable application" test "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case," *id.* at 694, or by unreasonably refusing "to extend that principle to

18

a new context where it should apply." *Williams*, 529 U.S. at 407.  A decision "unreasonably applies" established law where it is "objectively unreasonable," *id.*, meaning that the decision will be deferred to so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Even if the state court correctly identified and applied the appropriate Federal law, the AEDPA still permits relief to a habeas petitioner if a state court's "determination of the facts" is "unreasonable … in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The applicable rules for the federal court's consideration of state court findings of facts are found in § 2254(d)(2) and § 2254(e)(1), which provide that "a determination of a factual issue made by a State court shall be presumed to be correct," unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence."  The interplay of these sections is as follows:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2); see also *Williams*, 529 U.S. at 399, 120 S. Ct. 1495 (opinion of O'Connor, J).
>
> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by

definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).[5]

In performing an unreasonableness analysis under § 2254(d), a federal habeas court's first task is not to determine whether the state court's *decision* was reasonable, but whether the state court's precursor steps were reasonable. This is clear from the language of the statute, which asks whether the state court's decision was "based on" an unreasonable determination of the facts. For example, in *Panetti v. Quarterman*, 551 U.S. 930 (2007), the state court concluded that the prisoner was competent to be executed. The Supreme Court held that this decision was not entitled to deference under § 2254(d)(1) because the state court had not complied with the procedures specified in *Ford v. Wainwright*, 477 U.S. 399 (1986). Those procedures entitled the prisoner to a fair hearing and an opportunity to submit "expert psychiatric evidence that may differ from the State's own psychiatric examination," *id*. at 426-27. The record showed that the state court reached its competency determination without holding a hearing or providing Panetti with an adequate opportunity to provide his own expert evidence. The

---

[5] Sections 2254(e)(1) and 2254(d)(2) are "independent requirements" which do not "merge." *Id*. Section 2254(e)(1) only applies to situations where the district court admits evidence on a claim adjudicated by the state court.

20

Supreme Court held that the procedures the state court provided to Panetti were so deficient that they could not be reconciled with any reasonable interpretation of the *Ford* rule for purposes of § 2254(d). *Panetti*, 551 U.S. at 953.

Additionally, "'where the state court has before it, yet apparently ignores, evidence that supports [the] petitioner's claim,' the state court fact-finding process is defective" and based on an unreasonable determination of the facts. *Moore v. Hardee*, 723 F.3d 488, 499 (4th Cir. 2013) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir.2004)). For example, in *Brumfield v. Cain*, 135 S. Ct. 2269, 2273 (2015), the state court's adjudication was an unreasonable determination of the facts because the state court ignored evidence in the record that supported a finding of subaverage intelligence and impairment in adaptive skills without affording Brumfield "an evidentiary hearing or granting him time or funding to secure expert evidence."

This Court reviews a federal district court's determination that § 2254 precludes federal habeas relief *de novo*, *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015), and reviews a district court's determination of the facts for "clear error." *Wolfe v. Clarke*, 691 F.3d 410, 423 (4th Cir. 2012).

With respect to Issues II and III, for which Morva seeks a certificate of appealability ("COA"):

> [A] prisoner seeking a COA need only demonstrate "a substantial
> showing of the denial of a constitutional right." 28 U.S.C. §

21

2253(c). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further.

*Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Court explained further:

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. . . . This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statue forbids it.

*Id.* at 336. In short, *Miller-El* made clear that a petitioner need not prove,

> *before the issuance of a COA*, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

*Id.* at 337-38 (emphasis added). *See also, e.g.*, *Graves v. Cockrell*, 351 F.3d 143, 150 (5th Cir. 2003) ("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination").

On Issue II, a federal court ordinarily may not grant a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). If the petitioner has failed to exhaust the claims, but it would be futile to return to state court to exhaust these claims, "the technical requirements for exhaustion" have been met because "there are no state remedies any longer 'available' to him." *Coleman v. Thompson,* 501 U.S. 722, 732

(1991). In this situation, the federal court must determine whether the procedural default is excused due to "cause for the default and actual prejudice as a result of [an] alleged violation of federal law." *Id.* at 750.

While the United States Supreme Court has "not identified with precision exactly what constitutes 'cause' to excuse a procedural default," *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), a federal habeas petitioner may establish cause to overcome procedural defaults if he received the ineffective assistance of state habeas counsel in circumstances where state habeas proceedings were the first opportunity to raise claims such as ineffective assistance of counsel. *Martinez v. Ryan*¸ 132 S. Ct. 1309 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). This is the case in Virginia. *Juniper v. Davis*, No. 137 F.3d 28 (4th Cir. 2013); *Gray v. Pearson*, 526 Fed. Appx. 331 (4th Cir. 2013).

If this Court finds that the procedural default is excused because state habeas counsel was ineffective in failing to raise this substantial and clearly meritorious ineffective assistance, *Martinez, supra*¸ the limitations on relief of § 2254(d) do not apply and this Court applies *de novo* review. *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012) ("[W]hen a state court does not adjudicate a claim on the merits, AEDPA deference is inappropriate and a federal court must review the claim de novo").

On Issue III, the issues of the denial of discovery, funding, and an

23

evidentiary are subsumed within the substantive claim of ineffective assistance of counsel for which Morva seeks a COA. *See McCoy v. United States*, 266 F.3d 1245, 1248 n.2 (11th Cir. 2001) (noting that procedural issues that must be resolved before the court can address the underlying claim specified in a COA are presumed to be encompassed within the COA); *accord Stewart v. Secretary, Florida Department of Corrections*, 355 Fed. Appx. 275, 279 (11th Cir. 2009).

## ARGUMENT

### I.    The state court violated Morva's rights under the Eighth and Fourteenth Amendments by denying Morva the assistance of a "Risk Assessment Expert" on the issue of future dangerousness.

The Supreme Court of Virginia decision denying Morva the services of a relevant and necessary expert on Morva's future dangerousness while in prison resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law; and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  The district court's decision denying Morva relief on this issue was incorrect.

On direct appeal, Morva again argued that the trial court erred in denying his request for the expert and that in doing so, the trial judge violated two different constitutional rights: first and most importantly his due process right to rebut allegations of future dangerousness; and second his Eighth Amendment right to

24

present all relevant and mitigating evidence. The Supreme Court of Virginia rejected Morva's argument that he was unable to provide rebuttal evidence and held that the Commonwealth "neither proposed nor introduced any evidence concerning Morva's prospective life in prison," and, as a result, Dr. Cunningham's prospective testimony was not in rebuttal to any specific evidence concerning prison life. JA-980J (*Morva v. Commonwealth*, 683 S.E.2d 553, 563 (Va. 2009)). And despite the fact that Dr. Cunningham proposed to provide testimony that concerned Morva's history and background, prior behavior while incarcerated, age and educational attainment, and such factors that might bear on his adjustment to prison, the state court nevertheless held that Dr. Cunningham's proposed testimony was inadmissible because a portion of it pertained to information not particular to Morva – in that it was also true of other similarly situated inmates. The court found that the fact Morva would be single celled, locked down twenty-three hours a day, with individual or small group exercise, and shackled movement under escort, while greatly reducing the opportunity for serious violence toward others, is not relevant to the issue of Morva's future dangerousness because it is true for other inmates as well. JA-980L (*Id.* at 565). Thus, the court held that the lack of Dr. Cunningham's expert assistance did not result in a fundamentally unfair trial. JA-980L (*Id.* at 566).

The state court decision is contrary to United States Supreme Court

precedent. First, capital defendants enjoy a federal constitutional right to rebut allegations of future dangerousness, and where state law evidentiary restrictions impinge on that right, the restrictions must yield to "the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" *Skipper v. South Carolina*, 476 U.S. 1, 5 n.1 (1986) (quoting *Gardner v. Florida*, 430 U.S. 349, 362 (1977)).   And second, relevant mitigating factors are unlimited by well-settled Eighth Amendment law. *Hitchcock v. Dugger*, 481 U.S. 393 (1987); *Skipper*, 476 U.S. 1; *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978). Nevertheless, the Supreme Court of Virginia, relying on prior Virginia precedent, found that none of the cases cited above required Dr. Cunningham's proposed testimony to be admitted because a court has the authority to "exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Morva*, 683 S.E.2d at 564 (citing *Burns v. Commonwealth*, 541 S.E.2d 872, 893 (Va. 2001)).  This was despite the fact that Cunningham proposed to provide testimony that concerned Morva's history and background, prior behavior while incarcerated, age, and educational attainment, and such factors that might bear on his adjustment to prison, which does bear on Morva's character, record, and the circumstances of his offense.  The fact that Dr. Cunningham's evaluation of Morva considered the context of the risk, that is

26

where Morva, with his education, mental illness, age, background, criminal history etc. would be living, instead of an untethered and abstract evaluation, makes his opinion more relevant, not less.

Further, a state may not limit a capital defendant's due process right to rebut the prosecution's future dangerousness allegation to the same *types* of evidence relied upon by the prosecution. *Simmons v. South Carolina,* 512 U.S. 154 (1994). In *Simmons*, the Supreme Court recognized a federal due process right to inform a sentencing jury of a capital defendant's parole ineligibility as a means of rebutting the prosecution's claim of future dangerousness. It made no difference in *Simmons* that the prosecution had never mentioned parole, nor that Simmons' parole ineligibility was not a facet of his character, record, or the circumstances of his offense. Parole ineligibility was constitutionally relevant simply because it tended to lessen the chance that Simmons would commit more murders if not executed, and that was enough to require that he be allowed to inform the sentencing jurors that their "life" sentence option carried no chance of parole. *See also Kelly v. South Carolina*, 534 U.S. 246, 253 (2002); *Shafer v. South Carolina*, 532 U.S. 36, 52 (2001). To similar effect, the Supreme Court explained in *Skipper* that – as a matter of due process – "evidence of [a defendant's] probably future conduct *in prison*" is admissible whenever the prosecution is relying on a prediction of future dangerousness to seek the death penalty. 476 U.S. at 5 n.1 (emphasis added). The

27

Supreme Court's precedents do not permit a state to bar the jury from considering evidence directly bearing on the defendant's dangerousness – a defendant's age, education, prior criminal history, mental illness and background in the setting where he will actually live, simply because the evidence of where he will live also applies to some others, or because the evaluation does not bear on his dangerousness in a setting where he will never be.

The relevance of this for Morva's own case is obvious. Having presented evidence and argument at trial raising the issue of Morva's dangerousness as a reason to sentence him to death, the Commonwealth was not entitled to stifle his response by barring him from showing that the likelihood of his committing further violent crimes was actually quite low. And from identifying the actual reasons – i.e., his own background and record, the circumstances of his future life-time confinement, and the relevant base rates of serious violence among similarly situated life-sentenced murderers – why this was so.

Although the state court retains the ability to exclude irrelevant evidence, that ability is not unlimited. Rather, "[t]he defendant's character, prior criminal history, mental capacity, background, and age *are just a few of the many factors*, in addition to future dangerousness, that a jury may consider in fixing appropriate punishment." *Simmons*, 512 U.S. at 163 (emphasis added); *see McKoy v. North Carolina*, 494 U.S. 433, 441 (1990) ("our holdings in *Skipper* v. *South Carolina* . .

28

. and *Eddings* v. *Oklahoma* show that the mere declaration that evidence is 'legally irrelevant' to mitigation cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death."); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004).  Even outside the capital sentencing context, such restrictions on testimony and evidence cannot be reconciled with the basic due process right of a criminal defendant to present his defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  Accordingly, the state court erroneously rejected Dr. Cunningham's proffered risk assessment simply on the basis of his principled insistence that any reliable risk assessment must take into account *all* of the relevant facts and circumstances, including a defendant's future environment, bearing on a given offender's actual probable future conduct.  The error was objectively unreasonable, such that no "'fairminded jurist[] could disagree'" that the state court's decision was wrong.  *Harrington v. Richter*, 562 U.S. 86, 101–102 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Finally, Virginia is alone in excluding evidence about the threat the defendant poses in prison.  Although consideration of a defendant's prospective risk of violence is integral to capital sentencing proceedings nationwide, no jurisdiction other than Virginia has interpreted its capital sentencing scheme to forbid – or sharply restrict – the admission of evidence bearing on the specific risk

29

of violence that the defendant would pose in prison.  In contrast to Virginia, other jurisdictions recognize that prison-specific future dangerousness evidence, including expert evidence, is relevant, and, indeed, critical to the jury's prediction of the defendant's risk of violence.  For example, the Texas Court of Criminal Appeals has repeatedly made clear that the in-prison setting of a defendant's confinement is a vital component of the future dangerousness inquiry.  *See Coble v. State*, 330 S.W.3d 253, 269 (Tex. Crim. App. 2010).  Likewise, Oklahoma has held that prison-specific future-dangerousness evidence is relevant and admissible.  *See, e.g., Rojem v. State*, 207 P.3d 385, 389-92 (Okla. Crim. App. 2009) (permitting Dr. Cunningham to testify about the defendant's "potential for future dangerousness in prison" relying in part on a defendant's entitlement to a "meaningful chance to present his complete defense").  For purposes of future dangerousness, the Oregon Supreme Court has held that defense experts may testify about the minimal danger the defendant poses in prison.  *See State v. Douglas*, 800 P.2d 288, 296 (Or. 1990).

### *The District Court's Dismissal of this Claim*

The Warden argued in the district court that Morva's proffered evidence was not particular to Morva and so was "inadmissible as a matter of state law."  In dismissing this claim the district court did not adopt the Warden's argument.  Instead, the district court first found that the state court did not run afoul of the

30

ruling in *Skipper* because Morva was allowed to present the testimony of Captain Pilkins regarding Morva's good behavior while in jail awaiting his capital trial. JA-2993. The court also found that the state court decision was not unreasonable, either factually or legally, under § 2254(d) because "there is no United States Supreme Court decision hold that due process requires expert evidence on a capital defendant's future dangerousness while in prison based on statistical evidence . . . ." JA-2993. The court found that allowing the risk assessment expert to testify "about prison crime would simply confuse and mislead the jury." JA-2994. Finally, the court found that the prosecution's closing argument was not so unfair that it violated due process because, the district court incorrectly found, Morva first raised the issue of his dangerousness in prison, not the prosecution. JA-2995.

The district court is incorrect factually as well as misstating the issue. The point is not whether any Supreme Court case requires expert prison risk assessment testimony in the abstract, but whether the prosecution can rely on inferences about a defendant's future behavior in prison while insulating itself against rebuttal by a state law rule that treats all evidence testing those inferences as "irrelevant" if it includes base rates or "group statistical data" – which is the only sound scientific method for predicting future dangerousness. *Simmons* forecloses the argument that all rebuttal evidence on a capital defendant's likely future behavior must be unique or individualized to him, and after *Simmons* no reasonable jurist would think that

31

the effect of the *Gardner/Skipper/Simmons* right of rebuttal applies only to the exact facts of each of those three cases. This case presents what is simply another form of the same due process violation identified in *Simmons*; if anything, the excluded evidence here is much more individualized to Morva than was the blanket rule against parole that South Carolina excluded in *Simmons*, and Virginia's refusal to apply *Simmons's* holding to these facts was plainly wrong.

Dr. Cunningham directly addressed the question of whether prison violence risk assessments are "based on the individual character, record and history of the defendant, or whether they are simply projections based on nothing more than the conditions of confinement to which all [life-sentenced] murderers are subjected." JA-176. Dr. Cunningham's answer was that "a sound and reliable violence risk assessment of a convicted murderer draws upon the subject's own history and personal characteristics," and listed as relevant the following items: [Morva's] prior behavior while in incarceration; appraisals of his security requirements during incarceration; his age; his level of educational attainment; and, other features and characteristics regarding him. JA-177. Dr. Cunningham also provided the trial court an individualized discussion of what factors had been empirically demonstrated *not* to consistently predict greater violence risk in a prison setting. These factors included: "(1) the severity of the offense of conviction, (2) past violence in the community, and/or (3) escape history." JA-

32

179.  These are the precise factors that the Commonwealth argued in closing made Morva so dangerous.

The testimony of the jail guard lay witness as to Morva's behavior while awaiting trial was useful and relevant, but wholly insufficient by itself to rebut the Commonwealth's evidence and closing argument, because the lay testimony was simply information as to Morva's behavior in the past.  The lay testimony provided no basis for what the jury was asked to do: predict Morva's future behavior. Morva's expert was the only information that would have provided the jurors with a sound and accurate method for determining what facts were relevant and how to use those facts to make their determination on future dangerousness.

Further, the district court sub silentio decides this issue by adopting the tortured reasoning of the state court regarding the definition of "society." Obviously the Commonwealth first raised the issue of Morva's future dangerousness by talking about Morva's past acts and by stating that Morva is a "future danger to society." JA-2995, JA-865.  The district court apparently rests its decision on the fact that the Commonwealth did not use the words "future danger" and "prison" in the same sentence.  But just prior to arguing that Morva was a future danger, the Commonwealth explained to the jury that they "may impose the death penalty for future dangerousness, . . . .  And likewise you'll have a corollary for each of those for life in prison." JA-865.  When the Commonwealth -- a few

words later -- argued vehemently that Morva's past acts, writings, mental illness and characteristics would make him a future danger, it was in the context of the choices the Commonwealth had just proposed: the death penalty or life in prison. So it is obvious that the Commonwealth was referring to the only society that Morva would be exposed to: prison.

Finally, the district court is mistaken when it faults Morva by finding he waived his constitutional right to rebut the prosecution's fallacious argument because defense counsel made slightly more explicit the context of Morva's future dangerousness by actually using the word "prison" in discussing why Morva would not be a future danger to society. "The relevance of evidence of probable future conduct in prison as a factor in aggravation or mitigation of an offense is underscored in this particular case by the prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison. Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* and *Eddings* that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Skipper v. South Carolina*, 476 U.S. 1 n.5 (1986); *see People v. Smith*, 347 P.3d

34

530, 558 (Cal. 2015) (finding that where a prosecutor emphasized a defendant's escape attempts, threatening behavior toward correctional officers, and anti-social personality disorder, and emphasized the defendant's danger "into the future" the exclusion of a risk assessment expert was a violation of due process).

## II.    Trial counsel was ineffective in stipulating that Morva was a prisoner imprisoned and in "lawful custody" on August 20 and August 21.

Morva's killing of Derrick McFarland was not capital murder because it did not fit any of the statutory definitions of capital murder.  Va. Code § 18.2-31. Nevertheless, the Commonwealth charged Morva with killing McFarland in violation of Virginia Code § 18.2-31(3).  However, a necessary element for the capital murder of McFarland in violation of § 18.2-31(3) was that "while being *confined as a prisoner in* a local or state correctional facility . . . or while *in custody of an employee* thereof" Morva killed McFarland. *Id.* (emphasis added). Although Morva's legal status was "prisoner," he clearly was not "confined as a prisoner in" jail when he killed Mr. McFarland.  Equally clearly, Morva was not in the custody of an employee of the jail.  In fact, there were no facts on which the jury could have relied to find all the elements of the capital murder of McFarland. But they did not have to rely on facts because, inexplicably, trial counsel stipulated at trial that Morva was in lawful custody – a fact that was obviously, clearly, demonstrably not true.

"[A]n individual is in the custody of a law enforcement officer only where

35

there has been a clear and effective restraint of the individual by the officer, either by having the individual in his physical control or by the individual's voluntary submission to the officer's authority, such that the individual's freedom of movement is curtailed to a degree associated with a formal arrest." *White v. Commonwealth*, 591 S.E.2d 662, 668 (Va. 2004). Prior to killing McFarland, Morva clearly was not in the custody of the unconscious Deputy Sheriff Quesenberry (nor anyone else). Morva was clearly not effectively restrained, nor had he voluntarily submitted. Morva had rendered Quesenberry unconscious, taken his gun, and walked freely down the hospital hallway. JA-300-03. In fact, the jury found that Morva "after lawfully having been imprisoned in jail . . . did escape such confinement or custody . . . ."[6]

The question of whether a killing while in custody or a killing after an escape is sufficiently egregious to be capital murder is not obvious, as evinced by the widely differing approaches taken by the thirty-two state legislatures that have capital punishment statutes. Four states make neither killing necessarily a capital murder.[7] Several states, like Virginia, make a killing while in custody capital

---

[6] JA-501-03.

[7] *See* Idaho Code § 19-2515(9); Kentucky KRS § 532.025; R.R.S. Neb. § 29-2523; S.C. Code. Ann. § 16-3-20(C)(a).

murder, but not necessarily a killing during the course of an escape.[8] And, precisely contrary to Virginia, four states do not make a killing while in custody capital murder, but do make a killing during the course of an escape capital murder.[9] The plurality of states (sixteen), however, make both a killing while in custody and a killing in the course of an escape capital murder, and they do so by the careful and simple wording of their statutes. For example, in Delaware capital murder can be charged when the killing is "committed by a person in, or who has escaped from, the custody of a law-enforcement officer or place of confinement." 11 Del. C. § 4209 (e)(1)(a). In Georgia, capital murder may be charged when "[t]he offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement." O.C.G.A. § 17-10-30(b)(9). In South Dakota, a killing can be charged as capital murder when "[t]he offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement." S.D. Stat. Ann. § 23A-27A-1(8). In Tennessee, capital murder may be charged when "[t]he murder was committed by the defendant while the defendant was in lawful custody

---

[8] *See e.g.,* Kan. Stat. Ann. § 21-4636 ("murder of any person by an inmate in a correctional facility"); Mont. Code Ann. § 46-18-303 (murder "by an offender while in official detention").

[9] *See* Cal. Pen. Code § 190.2(a)(5); La. R.S. § 14:30(A)(1); NH RSA 630:5(VII)(j); Tex. Penal Code § 19.03(a)(4).

or in a place of lawful confinement or during the defendant's escape from lawful custody or from a place of lawful confinement." Tenn. Code Ann. § 39-13-204(i)(8).

Two things are apparent from these various state statutes. First, that an inmate who has escaped is no longer in custody. It is a "settled principle of statutory construction that every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Brown v. Commonwealth*, 733 S.E.2d 638, 641 (Va. 2012) (citations omitted). If one who escapes were still in some form of custody, then it would make meaningless that portion of the statute that refers to escape. Second, it is obvious from the various state statutes that if a state wants to charge as capital murder both a killing while in custody and a killing while escaping, it can do so easily, with clear and simple language.

Virginia's statute on the topic is clear and simple, it omits a killing after or during the escape as capital murder. A capital murder is "[t]he willful, deliberate, and premeditated killing of any person by *a prisoner confined in* a state or local correctional facility as defined in § 53.1-1, or while *in the custody of* an employee thereof . . . ." Va. Code § 18.2-31(3) (emphasis added). Unlike the statutes above in Delaware, Georgia, South Dakota, and Tennessee, Virginia clearly excludes from its capital murder statute a killing in the course of an escape. "It has long

38

been settled that penal statutes are to be construed strictly, and that one is not to be

subjected to a penalty unless the words of the statute plainly impose it." *United*

*States v. Campos-Serrano*, 404 U.S. 293, 297 (1971) (internal quotation marks and

citations omitted); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997)

(summarizing the canon of strict construction for criminal statutes); *see also*

*Brown*, 733 S.E.2d at 640 ("penal statutes are to be construed strictly against the

[Commonwealth and] cannot be extended by implication or be made to include

cases which are not within the letter and spirit of the statute").

> If language is clear and unambiguous, there is no need for
> construction by the court; the plain meaning and intent of the
> enactment will be given it.  When an enactment is clear and
> unequivocal, general rules for construction of statutes . . . do not
> apply.  Therefore, when the language of an enactment is free from
> ambiguity, resort to legislative history and extrinsic facts is not
> permitted . . . .

*Brown*, 733 S.E.2d at 640 (quoting *Brown v. Lukhard*, 330 S.E.2d 84, 87 (Va.

1985)).

Because trial counsel stipulated to a fact that was clearly not "fact" their

performance was deficient.   *Strickland v. Washington*, 466 U.S. 668 (1984).

Morva was prejudiced by trial counsel's error because if trial counsel had refused

the stipulation, either a motion to strike this capital charge by the defense would

have been successful or the jury could not have found Morva guilty of the capital

murder of Mr. McFarland.  *Id.*

39

And if the jury found Morva not guilty of the capital murder of McFarland it could have also changed the decision in Morva's favor in the jury's selection of punishment for the other capital charges: the killing of Mr. Sutphin and the killing of more than one person in a three year period. Because state habeas counsel was ineffective in failing to raise this substantial and clearly meritorious ineffective assistance of trial counsel claim, the procedural default from the failure to raise this issue in state court, is excused,[10] *Martinez v. Ryan*¸ 132 S. Ct. 1309 (2012), and this Court's review is *de novo*, *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012).

The Warden never seriously disputed this claim in the district court, but instead responded by mostly arguing procedural hurdles and misquoting inapposite ineffective assistance of counsel claims. The Warden argued that state habeas counsel *might* have strategically omitted this claim and thus could not have been ineffective. JA-2483-85. But state habeas counsel provided an affidavit stating that the omission of this claim was a mistake and that they would have included it if they had recognized the claim. JA-2817-18 ¶¶ 4-5. The Warden's main factual

---

[10] State habeas counsel, Michele Brace, concedes that she "completely overlooked" this claim, JA-2158 ¶4, that she now believes that this claim should have been "obvious" to her, JA-2159 ¶4, and that she would have included this claim in the state habeas petition, if she had recognized it, even if that meant, due to page limitations, dropping one of the claims that was included in the state habeas petition, *id.*

argument was that trial counsel entered this stipulation strategically to avoid putting the charging documents for the underlying offenses into evidence and thus "tainting" the jury. JA-2486. What the Warden apparently did not know is that this could not be true – the trial court had granted Morva's motion in limine to keep out these documents. JA-265, JA-2538.

The district court dismissed this claim on a basis not put forth by the Warden.[11] Recognizing that the Warden's arguments were unavailing, the district court did not find that Morva was not in custody under Virginia law. JA-3011-12. Instead, the district court focused on whether Morva was "confined as a prisoner in" a jail at the time he killed Mr. McFarland. JA-3012. The district court found that a "person's status as a prisoner is not dependent on his physical location." JA-3013. So, the district court reasoned, because Morva was "still a prisoner" his escape from custody "is of no moment." JA-3016.

The district court is incorrect. First, the cases analyzed by the court did not use the same language as the statute in Morva's case – they omitted the key word "confined." *See Mabe v. Commonwealth*, 417 S.E.2d 899, 900 (Va. Ct. App. 1992) ("It shall be unlawful for a prisoner in a state, local or community

---

[11] The district court states without citation to the record that the stipulation "was directed to the escape charge." JA-3010. While this does not weaken Morva's claim, it is also not true. The stipulation was clearly about both the capital murder charge and the escape charge. JA-251-253.

correctional facility . . . "); *Wood v. Cox*, 333 F. Supp. 1064, 1065 (W.D. Va. 1971) ("It shall be unlawful for an inmate in a penal institution . . ."); *Simmons v. Commonwealth*, 431 S.E.2d 335, 336 (Va. Ct. App. 1993) ("It shall be unlawful for a prisoner in a state, local or community correctional facility . . . "); *Jefferson v. Commonwealth*, 204 S.E.2d 258, 260 (Va. 1974) ("It shall be unlawful for an inmate in a penal institution . . ."); *Ruffin v. Commonwealth*, 62 Va. 790, 793, 21 Gratt. 790 (1872) (interpreting the phrase "such able-bodied convicts in the penitentiary . . . "). The only case cited by the district court in which the phrase "a prisoner *confined* in" appears is in *Mu'Min v. Commonwealth*, 389 S.E.2d 886, 894 (Va. 1990). But that is also the only case cited by the district court where the issue of whether the defendant was a prisoner at the time of the murder was not raised, so the interpretation of the statute and whether the defendant was a prisoner confined in a prison was not a controversy or issue in *Mu'Min*. Instead, Mu'Min was challenging the prejudicial use of a prior murder conviction to prove that he was a prisoner. *Id.*

Second, the rules of statutory construction are clear that every part of a statute is presumed to have some effect and no part will be considered meaningless. Clearly the word "confined" coupled with the word "in" is not meaningless in this statute. Morva does not dispute that he was an "inmate" or a "prisoner" at the time of the killing of McFarland. But clearly Morva was not

42

"confined as a prisoner in" the jail at the time of the killing.

In *S.Q. v. St. Anthony Reg'l Hosp.*, 805 N.W.2d 397 (Iowa Ct. App. 2011), the Iowa Court of Appeals was called upon to determine whether the statutory language "No person shall be involuntarily *confined* and restrained in any private institution or hospital or county hospital or other general hospital with a psychiatric ward for the care or treatment of persons with mental illness" applied to a person who was committed involuntarily to outpatient care. The court discussed the definition of confined:

> Black's Law Dictionary defines "confinement" as "[t]he act of imprisoning or restraining someone; the state of being imprisoned or restrained . . . ." Black's Law Dictionary 318 (8th ed. 2004). Webster's Third New International Dictionary defines "confined" as "kept in confines." Webster's Third New International Dictionary 476 (unabr. ed. 2002). "Confine" when used as a verb is defined as "to . . . restrain within limits," "to keep in narrow quarters: IMPRISON," "to hold within bounds." *Id.* These definitions suggest that the word "confined" applies to individuals who are forced to stay within a certain physical area.

*Id.* Thus, the court held, the legislature did not intend "confined" to apply to individuals committed to outpatient care, and the petitioner was therefore not confined and was not entitled to file a petition for writ of habeas corpus.

In this case, under standard rules of statutory construction, "*confined* as a prisoner *in*" a jail must only refer to a person who is actually *in* jail, not one who is *in or out* of jail. If the statute included a person who had escaped the jail, then it would render meaningless the words "confined" and "in." The district court's

43

analysis is thus incorrect because it ignored the import of the words "confined" and

"in" and thus misinterpreted the statute.

**III.    Trial counsel was ineffective for failing to conduct an adequate investigation into Morva's background, history, character, and mental illness; failing to provide the available information to the mental health experts in order to ensure an accurate and reliable mental health evaluation; and failing to adequately present all the available mitigating evidence in sentencing.**

The sentencing phase is "the most critical phase of a death penalty case,"

*Smith v. Mullin*, 379 F.3d 919, 939 (10th Cir. 2004), because "avoiding

execution [may be] the best and only realistic result possible," *Florida v. Nixon*,

543 U.S. 175, 191 (2004).   The sentencing body's possession of the fullest

information possible concerning the defendant's life and characteristics is,

therefore, essential, to the selection of the appropriate sentence.  *Lockett v. Ohio*,

438 U.S. 586 (1978).  If the sentencer fails to consider "those compassionate or

mitigating factors stemming from the diverse frailties of humankind," an

unacceptable risk exists that the death penalty will be imposed in spite of factors

that warrant a less severe penalty.

Given these parameters, trial defense counsel's goal in capital sentencing is

to allow for "the particularized consideration of relevant aspects of the character

and record" of the individual defendant.  *Woodson,* 428 U.S. at 303.  In the

mitigation presentation, there is no requirement that mitigating evidence even

have a "nexus" to the offenses or that the defendant make any showing that "the

44

criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina,* 476 U.S. 1, 5 (1986) (quoting *Lockett,* 438 U.S. at 604). At bottom, the sentencer must be allowed to consider any "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson*, 428 U.S. at 304. Thus, counsel must make every effort to "humanize" the defendant and allow the jury "to accurately gauge his moral culpability." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (per curiam).

In determining whether trial counsel provided ineffective assistance of counsel in failing to adequately investigate and present the available mitigation evidence, pursuant to the Sixth and Fourteenth Amendments, this Court must apply the standards set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). The *Strickland* standard is satisfied if a petitioner establishes both that his attorney's representation fell below an objective standard of reasonableness, *id.*, and that the petitioner was prejudiced by his attorney's substandard performance, *id.* at 692. *See also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam); *Winston v. Pearson*, 683 F.3d 489 (4th Cir. 2012);

45

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011); *Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008).

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. Likewise, counsel is not required to look "for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Rompilla*, 545 U.S. at 388. Nonetheless, a decision not to investigate "must be directly assessed for reasonableness in all the circumstances," *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691), and "an attorney must look into readily available sources of evidence," *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997). At minimum, investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 523 (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases Guideline 11.4.I(C) (1989)) (emphasis added).

Morva's trial counsel conducted an unreasonable and inadequate

46

investigation of Morva's childhood, family background, and mental illness; counsel failed to provide this information to mental health experts in order to ensure an accurate and reliable diagnosis; and counsel failed to adequately present all of the available mitigating evidence in the capital sentencing hearing.

### A.    Counsel's conduct was deficient and not based on any reasonable strategy.

Counsel knew that Morva's family had strong ties to Hungary, and that Will's[12] father, a hugely influential figure in his life,[13] fled Hungary during the Revolution. Counsel also knew that Morva's father was of Jewish heritage and suffered through the Holocaust. Despite this knowledge, counsel never investigated these topics. Had counsel's investigation met the standards of professional practice, they would have discovered that Morva is actually a dual citizen of Hungary and the United States, JA-2034-35, and would have uncovered the following facts, which Morva presented to the state court through pleadings, affidavits, and records. Morva additionally requested an evidentiary hearing in order to further prove the facts as alleged, but the state court

---

[12] For the sake of simplicity only, Appellant is referred to in this claim simply as "Will" and other family members are at times referred to only by their first names.

[13] JA-996-97, 1005, 1013, 1042, 1065, 1068, 1071-1116, 1118-19, 1134-37, 1140-41, 1147, 1150, 1153-56, 1166-67, 1237, 1240-44, 1328, 1357-79, 1389-97, 1400-01, 1419, 1440-41, 1475-77, 1488-89.

denied a hearing.

Will's father, Charles "Chuck" Akos Morva,[14] was born in Budapest, Hungary, in 1926. Chuck's mother was Jewish but converted to Catholicism, like many Jews in Hungary at the time.[15] JA-1561. Chuck's maternal aunt, Regina Weisz, primarily raised Chuck because his mother was ill and bedridden for most of her adult life. JA-1358. Regina had converted to Catholicism, but in 1944 – as World War II raged and the German Nazis occupied Hungary -- she and her family hid in Chuck's parents' home because their Jewish ancestry put them in danger. Unfortunately, Regina Weisz and her children were found by the Nazis. JA-1021, 1034, 1080, 1358. She was forcibly transferred to one of the infamous "ghettos" set up for Jews and there she was shot and killed. Her body was dumped into the Danube River. JA-1358, 1509-10, 1513-14. Chuck was 18 years old at the time, and the horror of what he witnessed in Budapest, and the murder of his aunt, had a devastating and lasting effect on him. JA-1232, 1358, 1366. To make his horror worse, Chuck was forced to serve in the Hungarian Army from 1944 to 1945. JA-1525. This was a military unit that

---

[14] Charles Morva was given many nicknames throughout his life. He is referred to as "Charles," "Chuck," or "Karsi" in this petition and in the affidavits presented in the state court proceedings.

[15] After World War I, many Hungarians supported the Nazi regime in Germany and anti-Semitism was rampant in Hungary.

supported Nazi Germany against the Soviets, as the Holocaust raged and the Nazis exterminated two-thirds of the Jewish population.   The effect of Chuck's participation, when half of his family was being persecuted for their Jewish heritage, was devastating and traumatic for him.

When the German Nazis were finally driven out of Hungary, Chuck suffered through the oppressive regime of a Soviet puppet government.   In 1956, Chuck became a commander for the short-lived but violent Hungarian Revolution.  He participated in very gruesome acts, such as hanging Soviet officials' dead bodies from the street lights in Budapest.  JA-1359.  When the Revolution was crushed and it became too dangerous for him to remain, Chuck fled Hungary with his first wife and two-year-old child.  JA-1622.  They escaped to Austria, and then fled to England, Scotland, and finally, Canada.  JA-1457.  Chuck became a member of the Canadian Army in the early 1960s and then pursued a career in engineering, which brought him to the United States in 1966, when Chuck was 40 years old. JA-1526, 1536-39, 1582, 1589-94.

Chuck's experiences explain a great deal about his character and the way he shaped his children.  In other words, as a man of Jewish heritage, Chuck was severely traumatized by the Holocaust, and the impact of this trauma influenced how he raised his children.  JA 996-97, 1005, 1013, 1042, 1065, 1068, 1071-1116, 1118-19, 1134-37, 1140-41, 1147, 1150, 1153-56, 1166-67, 1237,

1240-44, 1328, 1357-79, 1389-97, 1400-01, 1419, 1440-41, 1475-77, 1488-89.

Indeed, the threat of detention, deportation, and death that Chuck had experienced in Europe, and that had compelled him to deny his Jewish heritage in order to survive, had a continuing effect even in the United States more than 20 years later and throughout the remainder of his life. Chuck kept his children's Jewish heritage a secret from them until they were teenagers, and then swore them to silence. JA-1061, 1081-82, 1232, 1359-60. He was paranoid and obsessed by the idea that the Nazis would find him and kill his family. JA-1013, 1359-60.

Counsel's performance in investigating and presenting the multi-generational history of Will's mother also was deficient. They conducted only cursory interviews with her family members, failed to conduct interviews altogether with one of her children, Mike, and failed to request and obtain records to supplement their understanding of Will's background.

Elizabeth "Liz" Ann Dye was born to Loretta Mumford Dye and Charles Dye in 1952. She grew up in and around New Orleans, Louisiana. Liz's mother was ill from the time Liz was an infant, and she was unable to care for her children properly. JA-1058. Mrs. Dye became a "nervous wreck" and had a "nervous breakdown" in 1958. JA-1224.

By the time Liz was about six years old, her mother could no longer recognize her own children. She lay on the ground, catatonic, while an

ambulance came to take her to a hospital. JA-1019, 1058. Mrs. Dye was transferred to DePaul Mental Institute, where she was given electric shock therapy and brought out of her catatonic state. She was diagnosed with schizophrenia. JA-1019, 1073, 1224. After three months of treatment and her release from the Mental Institute, Mrs. Dye became an alcoholic. She had "emotional outbursts" and became "nasty" and "belligerent" when she drank. JA-1021, 1227. Decades later, Mrs. Dye died of complications due to cirrhosis. JA-1652.

Liz began dating her first husband, Del, when she was in high school. JA-1084. As soon as Liz was 18, she and Del married. Due to his abusiveness, JA-1029, 1074-78, 1230, Liz and her son, Nat, moved to her parents' house, and she was divorced by the time she was 21. JA-1078. She developed angina due to anxiety. JA-1030.

Liz joined a group for single parents and met Chuck Morva, a divorcee 26 years her senior. They had their first date in November 1977 and were married six months later. JA-1082. No one in Liz's family approved, because they thought Chuck was creepy, domineering, and much too old. JA-1030, 1061-62, 1231.

The cycle of control that characterized Chuck's relationship with Liz and his children began immediately. He moved Liz and Nat to another part of Louisiana, but that was "just the beginning of Chuck's manipulation and control

51

of [Liz]." JA-1031. After the birth of their daughter Emily, Chuck moved the family to Virginia where Mike and Will were born. Chuck isolated his family from the outside world and their extended family. JA-1030-31, 1038-39, 1061, 1231. In this controlling and abusive home, Liz developed more severe mental health problems.[16]

Will is the youngest son of Liz and Chuck. As a toddler, he spent almost all day locked inside his mother's bedroom in a playpen. JA-1035. Without a crib, he slept on the floor of his playpen surrounded by piles of diapers that were filled with his feces and urine. JA-1035. The Morvas' house in Chesterfield, Virginia, was filthy and covered with garbage. There was molded food and soiled paper plates stashed under mattresses in the home. The smell was unbearable, but no one cleaned it up. JA-1032. Will's parents did not bathe him frequently. Although Will spent the day surrounded by his own filth, he was bathed only once

---

[16] Liz's siblings and their children also developed mental health problems. Liz's brother Charles, known as "Bubba," had obsessive compulsive behaviors, suffered from panic attacks, was diagnosed with schizophrenia, and became an alcoholic. JA-1022-24. Loretta "Boo Boo" has Obsessive Compulsive Personality Disorder and has struggled with depression. JA-1228. The oldest sibling, Dionysia "Donnie," has two children that suffer from alcohol and drug addiction problems. JA-1028. Bubba's daughter, Angel, has Obsessive Compulsive Disorder for which she is on medication. JA-1024. Will's brother, Mike Morva, suffers from depression and is a recovering alcoholic. JA-1366, 1378, 1653-90. When charged with conspiracy to help Will escape, he was hospitalized in a state mental hospital for almost a year.

a week as a toddler. His parents were obsessed with the supposed detrimental effects of washing "good bacteria" off of the kids' bodies. JA-1036. Instead of bathing the children, Liz sprayed their feet with Lysol and scrubbed their genitals and hands with rubbing alcohol. JA-1036-37. Liz's hands were rough and cracked from the amount of alcohol she used to wipe herself and her children. JA-1234.

Liz was distraught and unable to care for her children due to her own personal and mental health problems, and when Chuck was home things only got worse. JA-1031-35, 1037-38. Chuck slapped Will in the face on an almost daily basis, even though Will did not misbehave. When Chuck slapped Will, he slapped him multiple times in a row. JA-1087, 1360. Chuck also slapped the other children. On one occasion, when Will's sister Emily was in sixth grade, Chuck jabbed Emily in the eye with his finger, which caused her eye to bleed and swell. Before Chuck allowed Emily to go to the hospital, he sat all of his children down and made Emily promise that she would not tell anyone that he had hit her. He told her to lie, and to say that she was riding her bike and fell off. JA-1362. Will and the other siblings were similarly sworn to secrecy. Chuck told the children that if they ever told anyone what he had done, the kids "would be taken away forever and put in foster care. He guaranteed [them] that foster care would be worse than living under his roof." JA-1362.

53

Chuck had unreasonable demands and expectations for his children.  When Will did not meet these expectations, even as a young child, he was berated and chastised.  JA-1086-87.  Chuck called Will "stupid," JA-1039, 1062, 1087, 1236, 1458-59, and a "little asshole," JA-1087, 1360-61, frequently.  He abused him physically and threatened even bloodier abuse by telling Will that his "blood [would] flow like a river."  JA-1361.  As a child, Will did not object, resist, or otherwise stand up for himself; he merely accepted the abuse.  JA-1361, 1364, 1366.

The Morva children were poorly nourished.  Their typical breakfast consisted of milk and bread.  Lunch was milk and cheese.  JA-1033.  Liz and Chuck did not eat the same food they gave the children and did not share their own food with them.  Liz locked specialty food items in her bedroom away from the children, and Chuck gorged on fast food.  JA-1034.

The children were rarely allowed to play outside with neighborhood kids. Those who witnessed the abusive home life were too afraid of Chuck to call social services or the police and the family would have rebuffed any investigation attempts because they were trained to limit their interaction with people outside the family.  JA-1038-39.  Chuck's behavior throughout Will's childhood was unpredictable, neurotic, relentless, overpowering, domineering, controlling, and abusive.  JA-1031, 1039-41, 1062-65, 1087, 1231-36, 1360.

54

As Will grew older, the abuse became more difficult to endure. Will spent his childhood in terror; his environment was unpredictable and controlling. The only thing he knew with certainty was his father's relentless abuse and violence. Will had always been meek and sensitive, and he tried not to provoke his father. However, when Will was in his early teens, he finally mustered the courage to object to his father's abuse. JA-1141, 1364, 1432. In response, Chuck pushed Will down a flight of stairs. No one attended to Will as he lay at the bottom of the stairs injured and crying. JA-1364. After this event, Chuck dismissed Will and hardly spoke to him for the rest of Will's adolescence and formative years. JA-1364-65. Will grew to hate his father and was very resentful. JA-1097, 1365-66, 1401.

The family moved to Blacksburg, Virginia, in 1996. The home in Blacksburg was no better than the one in Chesterfield. It was sparsely furnished and the family had boxes filling the living room. It was like a "rat's nest" because the house was so messy and disorganized. JA-1400-01. Although Will was a teenager, there was no furniture in his bedroom. He slept on the floor with a pile of clothes as his pillow. JA-1154, 1401.

Will never wanted to go home, never had a curfew, and never seemed to have family obligations. JA-996-97, 1004, 1013-14, 1118-19, 1126-27, 1141, 1154-56, 1193, 1241, 1389-90, 1404-05, 1415, 1431-1433, 1440-41. Will often

55

stayed for extended periods at friends' houses while he was in high school and his parents did not seem to notice or care.  JA-1415.  On one of these occasions, he asked his friend, Lea Bowman, to drive him to his parent's house so he could pick up his stuff.  They first stopped at a grocery store where Will picked up two brown paper grocery bags.  When he went to his room to pack, he fit all of his belongings in the two paper bags.  JA-1154.  Will stayed wherever he could -- including in the streets and even in a rundown "crackhouse," which sometimes housed ten young homeless people, and often did not have electricity, water, or food.  JA-1194.

Will was bullied by the popular crowd in high school; they threw food at him in the cafeteria, called him "gay," and a "faggot."  JA-1140, 1372, 1387-88.  This problem was deliberately exacerbated because Chuck made Will wear dresses to school on occasion in order to "toughen him up."  JA-1140-41.

Will never graduated from high school.  His parents moved from Blacksburg back to Richmond,[17] and Will was on his own.  He stayed at the family's vacated townhouse in Blacksburg until they cut off the utilities and he had to pack up and leave.  JA-1372.  He had no place to go.

Trial counsel did not conduct interviews or try to obtain any records that

---

[17] Chuck died in 2004, about a year before Will was arrested for the attempted robberies that led to his confinement preceding the current capital charges.

were relevant to the history of either Will's paternal or maternal side of the family. They conducted little or no investigation of his immediate family, much less a multi-generational family history. They collected only medical and incarceration records related to Will. Their failure to collect other documents was compounded by their failure to elicit family history from mitigation witnesses.

None of Will's family members testified at his capital murder trial. Defense witnesses who mentioned Will's home life had no direct experience of it and made only sparse and unsubstantiated comments. Their testimony provided only a pale shadow of Will's history and background: "I got the impression he had some problems with his father," JA-664; Will's father had "a thick accent" and "wanted him to take a lot of advanced classes," JA-669; "As far as I can tell from looking back at it, he never really liked to go home," JA-694; after the death of Will's father, he worried about his mother because "she was currently living out of her car . . . He had a lot of respect for his father. . .", JA-727-28. No one testified who had direct experience with Will's family or knowledge of the complexities of his family situation.

Trial counsel's inadequate investigation deprived jurors of extensive, relevant, and accurate information about Morva's history, background, and character -- evidence that explained how he developed or that diminished his moral culpability. Trial counsel failed to sufficiently investigate people who

could have provided meaningful insight into his home life, even though Will specifically told counsel to talk to some of them.   JA-987, 996-97, 1013-14, 1068, 1118-19, 1127, 1154, 1166-67, 1185-86, 1193-94, 1196-97, 1241-42, 1321, 1401, 1404-05, 1415, 1420-22, 1432, 1475, 1440-41.

Counsel also unreasonably failed to obtain information from friends and family about the symptoms of Morva's apparent descent into mental illness, which, if reviewed by the trial experts, would have raised "plenty of 'red flags' pointing" to a more serious mental illness. *Rompilla v. Beard*, 545 U.S. 374, 392 (2005).

As a child and teenager, Morva was described as sweet, sensitive, and compassionate.   As a teenager, Morva had a reputation among his peers for defending the underdog and advocating for social justice issues. JA-1013, 1107. He also was intellectually curious about the world around him.   He enjoyed talking about politics, social justice, philosophy, religion, and the arts.

Witnesses have differing recollections about when they noticed a change in Morva, but at some point each recognized a progressive and troubling transformation.   Both friends and family became concerned that he was exhibiting symptoms of a mental illness.   JA-1091, 1100-02, 1109, 1133, 1350-51.   Even though Morva still professed a belief in many of the ideals he previously held, those beliefs became inflexible, irrational, and unusual.   Rather than engaging in

58

a back- and-forth dialogue, Morva attempted to persuade others of the veracity of his fixed and unorthodox beliefs.

His beliefs centered around one theme: Modern civilization was universally bad and was destroying the earth in an unidentified way. The destruction was imminent -- perhaps as imminent as 2020 -- and immediate and drastic steps were necessary to save the world. JA-1332. Morva "thought he was 'chosen,' of a different kind, and able to fix all the problems of the world on his own." JA-991, 1331-33. He "believed that he could save the innocent ones from the destructive forces in the world." JA-1394. He had "knowledge no one else [had]." JA-1102.

Morva told close friends "that he felt like he was being called by some grand entity -- like a religious calling -- almost like a battle call. He said he was being called forth to reckon with certain negative powers." JA-1332. *See also* JA-985-88, 1333-35, 1374-75, 1394-95. "[H]is sense of being called was clearly based on the supernatural. He seemed to think his calling involved some sort of personal sacrifice on his part." JA-1332, 1394. Morva told his brother that "the White Buffalo came to him in spirit form and informed him that he was going to be the next savior of the Native American people." JA-1375.

Morva talked about training for the fast-approaching day when he would have to fulfill his mission. He told friends and family that he was living in the

woods for weeks at a time hunting, building shelters, and learning how to survive on the foliage in the forest.  JA-1006, 1015, 1099-1100, 1106, 1132, 1145, 1166, 1182, 1334, 1348, 1375, 1436.  He ran, to keep in shape, and walked barefoot in order to toughen up his feet.  JA-1100, 1145, 1347.  He began to accumulate weapons.  He told friends that "he had guns buried in Jefferson National Forest" and he carried a gun around.  JA-1006, 1148, 1157, 1329.  He was "training for a military apocalypse."  JA-1146, 1482.

Morva saw the world in absolutes.  "All Native Americans were good, pure, innocent people, and the rest of modern civilization was bad."  JA-1394. Morva explained to friends that he was going to go live with Native Americans on a reservation and that "the Native Americans on the reservations would immediately welcome him into the tribe because they would recognize his facial features."  JA-1347-48.  Morva also talked about his plans to go live with a secret, hidden tribe of indigenous people in South America.  Morva said "the indigenous people of South America would also welcome him because they would immediately recognize him."  JA-1348.  Then he would lead them in a fight to resist and combat modern society's destructive forces.  JA-1106, 1145, 1199, 1254, 132, 1347.  "He also talked about preparing for the apocalypse so that he would be ready to fight."  JA-1015.

60

Morva also "talked about a special team of people he was gathering to carry out some sort of plan to save the world." JA-986, 1348. These people were not privy to the entire plan, but instead Morva "intimated he that he would parcel out this special knowledge little by little, when he felt that [they were] able to understand and appreciate it." JA-987. Morva did not want members of the team "to talk about it with others, because he did not think they would understand." JA-986, 988.

Although Morva had special abilities and unique knowledge, JA-1135-36, he also encountered obstacles to fulfilling his mission. The first were his physical health problems. Morva was afflicted with irritable bowel syndrome ("IBS"), which he considered life-endangering. He told people "that he would die if he couldn't get to the toilet in time due to his stomach problems." JA-989, 1209. This condition curtailed normal activity because he was tied to the bathroom for an hour or more each day in order to pass bowel movements. JA-1184-85, 1321. He blamed this physical condition for his inability to obtain and hold a job. JA-1157, 1328-29, 1481. He said the serious digestive problems required him to eat an odd diet of raw or nearly raw meat, carbohydrates, and dairy products. JA-1053, 1147, 1354. Morva told people that his IBS was caused, in large part, by his ethnic heritage. To combat his physical challenges, therefore, Morva conformed his diet to the demands of his

61

ethnic heritage. JA-1092, 1166, 1190. He said "that deviating from the Inuit diet was what caused [his] stomach problems." JA-1190.

"Not only did Will believe he was called, but he believed that people were trying to get to him in order to stop him from fulfilling his mission." JA-1332. These were the people currently holding the reins of power and unnamed destructive and negative forces. JA-1101, 1136, 1166, 1332. Morva "honestly believed that the Blacksburg Police Department was in cahoots with the Bush Administration and that they were out to get him. He felt personally persecuted." JA-1206. "He thought the system was going to come after him violently." JA-1333. Morva "believed that the government tapped phones when he was speaking on them and followed him. He thought the government [was] out to get him and that he was under constant surveillance." JA-1136.

Morva "insisted this persecution and surveillance had begun before he was arrested on the robbery charges and that the robbery charges may have been a pretext for silencing him." JA-1101, 1136, 1167. This harassment and his subsequent incarceration were not mere threats to Morva's safety. Nor were they mere examples of the tyrannical and destructive forces Morva was fighting against. Morva "had come to see his role in life as fighting authority, and he believed he didn't have a choice but to fight this fight. As he explained it[,] . . . he had been chosen and had an obligation to fight." JA-1337. While Morva--the

62

chosen one--was wasting away in a county jail, destructive forces continued their work. In his view there were only two types of people: good and bad. The good people fight to save Earth and its innocent inhabitants and the bad people fight to destroy. He saw no room for ambiguity; there were no shades of gray.

As the months passed after his arrest for attempted robbery, Morva kept up his efforts to be bonded out of Montgomery County Jail, to no avail. Morva believed his digestive problems grew increasingly serious as he lost control over his diet. JA-1271, 1295-96, 1754-1996. As the days passed, he grew weaker and the destruction continued. Morva, believing that the fate of the world was literally at stake and that he was in imminent danger of death, concluded that drastic measures were required. He escaped jail in order to regain strength and return to his efforts to protect the innocent people and combat the destructive forces, the mission he was called to complete. When the destructive forces tried to stop him, he defended himself. It was imperative that he be free in order to save the Earth. JA-1134.

When given the opportunity to address the court before it imposed sentence, Morva made a desperate, final effort to warn people and express his profound belief that there were others chosen, like him, who would complete the task he was sentenced to die without accomplishing.

> I wasn't prepared to say anything so I'll just say whatever, I'll say it however simply I can . . . . Now, the media and . . . my own

63

attorneys and doctors, they said . . . [t]hat I had no empathy. That I had no compassion, which is, of course, obviously, again, complete bogus. But I don't think that anyone in this Courtroom, except for a very small handful of people, do have any empathy or compassion because I think that the people in here are sick with greed . . . . And now I will say a few things. One, my name is not William Morva. My name is Nemo.[18] A slave name. Two, you people, your whole society, you go and you sleep at night with these huge smiles on your faces because you get away with all the evil things that you do to each other and to the whole planet, the whole earth. You get away with it because no one stops you and you think that you will always get away with it. You believe this because you always have for a thousand years . . . . You may kill me and that's guaranteed. I can't fight. There's nothing more I can do, but there are others like me and I hope you know that and soon they're going to get together. They're going to sweep over your whole civilization and they're going to wipe these smiles off of your faces forever.

JA-946-48.

In addition to presenting this powerful mitigation evidence to the jury through the lay witnesses, competent counsel would have investigated and informed their mental health experts of Morva's delusions and aberrant thoughts. Nonetheless, counsel failed to provide information that was within counsel's knowledge to the mental health experts. Specifically, trial counsel recognized early on that Morva exhibited mental health problems and requested an evaluation for competency to stand trial and appointment of two mental health experts. JA-17-22, 212-20. Despite the inadequate quality of trial counsel's

---

[18] "'Nemo' is Latin for 'no one' or 'nobody.' It represents the death of self, of autonomy, and of one's social identity." JA-1391.

64

mitigation investigation, their cursory interviews with Morva's family and friends uncovered pertinent information. In further violation of the Sixth and Fourteenth Amendments, *Strickland v. Washington,* 466 U.S. 668 (1984)*,* counsel unreasonably failed to advise the appointed mental health experts of this information, failed to provide the mental health expert with notes of the witness interviews, and failed to arrange for these witnesses to speak directly with the mental health experts. It was unreasonable for counsel not to provide these experts with the information necessary to make accurate and informed diagnoses. *See McCarver v. Lee*, 221 F.3d 583, 594 (4th Cir. 2000) ("we assume that it would be in the defendant's best interest to have that expert obtain as much data and as many prior evaluations of that defendant, from as many sources as possible, as are available, so that the expert can form a full and credible picture of the defendant's psychological make-up").

The majority of records counsel provided to the mental health expert witnesses related to Morva's incarceration and court proceedings. Counsel also provided the mental health experts with school records, notes from Morva's medical visits to a gastroenterologist and an otolaryngologist, and police reports of witness statements from Morva's codefendants in the attempted robbery charges and people who recognized Morva from hanging around Blacksburg. JA-790.

Counsel had conducted cursory interviews with some of the people who gave statements to state habeas counsel, including, most importantly, Qato Burkhart, Mark Williams, and Father James Arsenault. JA-1138, 1337-38, 1397. Each of these three witnesses had invaluable insight into Morva's mental state. For the eighteen months that Morva was incarcerated at New River Valley Regional Jail, he had frequent visits with Arsenault. Arsenault, who had experience in counseling, noticed signs and symptoms of mental illness. JA-1131, 1133-36. Burkhart, who was good friends with Morva in high school, corresponded regularly with Morva throughout his incarceration at New River and noticed a significant change in him. JA-1391-97. Morva told trial counsel that Williams was his best friend and that he had lived with him off and on for the four years prior to being arrested for attempted armed robbery. When Williams spoke with trial counsel, he told them he had noticed significant changes in Morva's mental health during the many years he was best friends with Morva. JA-1337. With regard to these three key witnesses, counsel provided mental health experts only with a police report of a statement Williams made in 2005, notes of an initial ten-minute phone conversation with Williams, and a list of witnesses Arsenault recommended counsel contact. Counsel made no mention of Burkhart. All three were willing to speak to Morva's mental health expert.

The only collateral interviews the court-appointed experts conducted were

66

with Morva's mother and sister. JA-790. Morva had not lived in the same city as his mother since 2000, five years prior to his arrest and seven years prior to his forensic mental health examination. JA-1097. In August 2007, the mental health expert contacted trial counsel and inquired whether there were any of Morva's acquaintances with whom he might speak. At that time, he had only spoken with Morva's mother. In response, trial counsel put him in touch with Morva's sister. Morva had not lived in the same city as his sister since 1996 or 1997, eight years prior to his arrest and ten years prior to his forensic mental health examination. JA-1464-65. Although both Morva's mother and sister were capable of giving the experts information regarding Morva's childhood and adolescence, neither had regular exposure to him in the years after he became an adult.

Despite the expert's request for access to people who had experience with Morva, counsel failed to advise the experts of the existence and availability of Burkhart, Williams, and Arsenault. If the experts had been put in touch with these witnesses, they would have recognized the need for further investigation and information with regard to Morva's mental health. The experts also would have been able to provide guidance to trial counsel about what type of information would be helpful to them as they sought to make an accurate diagnosis.

Counsel's omissions prevented the experts from learning, for example, that Morva "believed he had special combat capabilities that enable him to do

67

extraordinary things," JA-1395; that Morva was incapable of speaking rationally about certain subjects including "his own exceptional abilities, the descriptions of individuals as either completely good or completely evil, and the plight of oppressed people," JA-1396; that Morva believed he had developed an idea for a perpetual motion machine that would solve the world's energy crisis and the government had him under surveillance and had concocted attempted robbery charges as a pretext for silencing him and his theories, JA-1135-36; and that after Morva's father died, he "seemed afraid of systems of thought, certain ideologies, and civilization in general."  JA-1329.

### B.    Morva was prejudiced by trial counsel's deficient conduct.

A finding of prejudice under *Strickland* requires a showing "that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different."  *Strickland,* 466 U.S. at 694. *Strickland* defined "reasonable probability" as a "probability sufficient to undermine confidence in the outcome" of the proceeding.  *Id.* at 692.  This test is not, however, an outcome determinative inquiry.  In other words, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."  *Id.* at 694.  Thus, "a defendant need *not* show that counsel's deficient conduct more likely than not altered the

outcome in the case." *Id.* at 693 (emphasis added). Prejudice is established if "there is a reasonable probability that *at least one juror* would have struck a different balance" but for counsel's errors. *Wiggins*, 539 U.S. at 537 (emphasis added). In determining prejudice, this Court must "evaluate the totality of the evidence – 'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98). *See also Sears*, 561 U.S. at 956 (a proper prejudice analysis must consider "the newly uncovered evidence" and the mitigation evidence introduced during sentencing").

Counsel's inadequate investigation of Morva's multi-generational history deprived Morva's jurors of a complex, multifaceted description of Morva as a human being and prejudiced him. Will was a product of his environment, and his caretakers' backgrounds and limitations directly affected Will. An adequate investigation of Will's family and cultural history was necessary for jurors to have an accurate understanding of Will's culture, background, and life story. Counsel recognized the importance of uncovering the family dynamics. In their opening statement in the trial phase, they stated:

> This case didn't start in 2005 or 2006. This case really begins with the birth of this young man back in 1982 in Richmond, Virginia. Will was born then the son of Charles and Elizabeth Morva, and they lived outside the Richmond area. Mr. Morva, his dad, was a mechanical engineer with Allied Chemical in Hopewell, Virginia. . . . Will lived in a home with a brother, a half-brother named Nat, a full

69

> brother named Michael, a sister named Emily, and his parents. . . .
> And during this trial, you'll hear some of the dynamics about this
> family.

JA-275. Counsel did not deliver on this promise. The opening statement was all the jury got to hear about Will's family: a promise to explain the family dynamic and nothing more. They certainly did not hear about the "dynamics" of the family. This is the same type of "halfhearted mitigation" argument made – without evidence supporting it -- found to be deficient and prejudicial in *Wiggins*, 539 U.S. at 526.

Counsel's focus, in both the trial and penalty phases, was not on the *who* or the *how* of the crime, but the *why*. JA-275, 507-08. A large part of the answer was available in the information they were professionally obligated to obtain, but did not.

A constitutionally adequate investigation and disclosure of information by counsel would have greatly increased the likelihood of an accurate diagnosis that Morva has an Axis I diagnosis of delusional disorder. Trial counsel, like state and federal habeas counsel, are not qualified to diagnose Morva's condition. State habeas counsel sought expert assistance, which was denied. Nonetheless, they proffered the affidavits of Dale Watson, Ph.D., JA-2047-2102, and Leslie Lebowitz, Ph.D., JA-2235-45. Dr. Watson reviewed numerous affidavits and records as listed in his affidavit. Dr. Lebowitz relied on Dr. Watson's analysis

70

of the information.

Among other things, Dr. Watson noted "a significant family history of mental illness, including schizophrenia, obsessive compulsive disorder, and delusional disorder." He also noted "the possibility that Mr. Morva's somatic concerns [primarily related to irritable bowel syndrome] were actually somatic delusions" related to schizophrenia, obsessive compulsive disorder, delusional disorder, or other serious mental illness.

Likewise, Dr. Watson recommended that a mental health with specific expertise in trauma was necessary because:

> The available information indicates that Mr. Morva was exposed to abuse during his childhood that included physical abuse, verbal abuse, and emotional abuse.  Consideration needs to be made as to whether Mr. Morva may have suffered from a complex trauma syndrome (i.e., complex Posttraumatic Stress Disorder or a Disorder of Extreme Stress Not Otherwise Specified (DESNOS)), or other effects of trauma. Such disorders result from the chronic effects of repeated experiences of abuse.

Dr. Lebowitz, a trauma expert, "extensive psychopathology" in the family, JA-2240, including the experiences and impact of Morva's father's survival of the Holocaust in Europe and his significant combat experience, which likely affected William "Morva's development through what mental health professionals refer to as inter-generational or trans-generational trauma transmission."  In addition, Morva's father was described as being "verbally, psychologically, and physically abusive" and his home "fraught with pervasive

71

fear and anxiety."  Dr. Lebowitz also noted that there is an extensive pattern of mental illness in William Morva's maternal family history and in his immediate family.  Specifically, Morva's "brother Michael has been diagnosed with the major mental illness of Delusional Disorder, and there are indications that William Morva suffers from the same illness."  Morva's mother also exhibited mental illness.  As Dr. Lebowitz noted:

> Unfortunately, her obsessions and concerns interacted with her husband's obsessions in ways that were likely very costly for Mr. Morva.  Their childhood home is described as putrid and filthy, the children as being underfed, neglected, and verbally denigrated. Charles Morva prevented the children from bathing, because he was afraid of washing away good bacteria, and Elizabeth Morva was so afraid of germs she disinfected her children's genitals with Lysol and their hands with alcohol. . . .  Together Mr. Morva's parents seemed to have created an environment that was chaotic, confusing, depriving, neglectful, defined by atypical beliefs and concerns, and punctuated by frightening screaming, verbal abuse, and periodic violence.

JA-2241.

Aside from these affidavits, state habeas counsel pointed to the American Psychiatric Association, Diagnostic And Statistical Manual Of Mental Disorders (4th ed.  Text Revision 2000) ("DSM-IV-TR") to support the allegation that trial counsel failed to discover evidence that suggests an Axis I disorder (most likely schizophrenia, obsessive compulsive disorder, and/or

delusional disorder) rather than an Axis II personality disorder.[19]

"The essential feature of Delusional Disorder is the presence of one or more nonbizarre delusions that persist for at least 1 month." DSM-IV-TR § 297.1. A delusion is a "false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary." DSM-IV-TR 820. *See also* Bruce J. Cohen, Theory and Practice of Psychiatry 34 (2003).[20]

The distinguishing difference between a delusion and an overvalued idea is the intensity with which an individual clings to it. Because of counsel's deficient performance, the experts did not know how tenaciously Morva clung to his beliefs in the face of rational argument and incontrovertible evidence to the contrary. He was immovable with regard to the contents of his delusions. When

---

[19] DSM-V was published in 2013, but the DSM-IV-TR is addressed here as it was in state habeas.

[20] A delusion is nonbizarre when it involves a situation that could occur in real life. An example of a nonbizarre delusion is the fixed and false belief that one is being followed, despite all evidence and rational argument to the contrary. An example of a bizarre delusion is the fixed and false belief that aliens have removed one's internal organs and replaced them with another person's organs and left no wounds or scars. DSM IV TR § 297.1. *See also* Cohen, *supra* 35. This distinction between bizarre and nonbizarre delusions is important when distinguishing between Delusional Disorder and Schizophrenia. DSM-IV-TR § 297.1. *See also* Cohen, *supra* 35.

friends tried to persuade him that entire groups of people did not fit into absolute categories of "good" and "bad," he rejected their ideas.  JA-1394-95.  He "got frustrated with people . . . who didn't see or understand the bigger picture as he understood it." JA-1332.  He "could not understand why [others] didn't comprehend his ideas.  He thought he was making perfect sense."  JA-1332.  If someone did not take Morva seriously when he discussed the content of his delusions, he would get angry.  JA-1348.  When friends disagreed, Morva claimed they "were drunk and couldn't understand him or weren't worthy of his ideas." JA-992.  *See also* JA-1135-36.

Like many mental illnesses, Delusional Disorder has subtypes with varying symptoms.  For example, "Grandiose delusions may have a religious content (e.g., the person believes that he or she has a special message from a deity)."  DSM-IV-TR § 297.1.  In an individual with Somatic delusions, an actual physical disorder may be present but will be insufficient to explain the individual's complaint.  Alistair Munro, Delusional Disorder 72 (1999).  Among the most common central themes of somatic delusions is the belief "that parts of the body (e.g., the large intestine) are not functioning."  DSM-IV-TR § 297.1.

Morva visited Dr. Ringold, a gastroenterologist, in 2003 and was diagnosed with IBS. At that time, however, he not only described symptoms that were highly unusual and lacked apparent scientific basis, but also described success

74

with self-treatment methods that had no scientific basis for alleviating his symptoms. JA-1265-70, 1293-94. As Dr. Ringold explained during the state habeas proceedings:

> I have patients who are absolutely obsessed with their bowel movements as though their lives revolve around their ability or inability to pass a bowel movement. William, however, was two standard deviations from the mean. He was more unusual, by far, than any of my other patients. William's symptoms just didn't make sense scientifically.

JA-1270. "William clearly has psychological issues that make him think his symptoms are *all* real. William believes that he exhibits symptoms that just aren't scientifically accurate or reasonable." JA-1277.

Another characteristic of individuals with Delusional Disorder is the apparent normality of their behavior and appearance when their delusional ideas are not being discussed or acted on." DSM-IV-TR § 297.1.

> One of the most unique and striking features of delusional disorder is the way in which the patient can move between the delusional and normal modes of thought and behavior. In the former, the individual is overalerted, preoccupied with the delusional ideas, and gives a sense of being remorselessly driven. In contrast, the normal mode is associated with a relatively calm mood, reasonable range of affect, neutral conversation with an ability to be engaged in everyday topics, and some capacity for pursuit of normal activities. But the delusional beliefs are always nearby, ready to pounce and to change the person's whole attitude and demeanor. A comparison with Dr. Jekyll and Mr. Hyde is not totally inappropriate.

Munro, *supra* 50.

Undeniably, Morva exhibits some odd behaviors and has decreased

functionality, as evidenced by his inability to maintain employment or a consistent residence. However, his odd behaviors and decreased functionality make sense in the context of his delusions. For example, he clung to the fixed and false belief that his IBS was so severe that it would be life threatening if he were unable to use the restroom in a timely and prolonged manner.

Outside the context of his delusions, Morva "is able to talk coherently and intelligently about a wide variety of subjects such as literature, the arts, history, and facts and figures of the world, [but] he becomes completely irrational and emotional" when discussing subjects such as "his own exceptional abilities, the descriptions of individuals as either completely good or completely evil, and the plight of oppressed people." JA-1396.

As state habeas counsel alleged, there are additional criteria for Delusional Disorder that appeared to be consistent with Morva's statements and conduct, but the function of this discussion is not to make a specific diagnosis. Its function is to show that with the additional information counsel failed to obtain, there is a reasonable probability the court-appointed mental health experts would have diagnosed Morva with this Axis I disorder.

The trial-level diagnosis of a personality disorder does not rule out the more serious diagnosis of Delusional Disorder. "Many of the specific criteria for the Personality Disorders describe features (e.g., suspiciousness, dependency,

76

or insensitivity) that are also characteristic of episodes of Axis I mental disorders." DSM-IV-TR at 688. "Certain personality disorders can have features reminiscent of the delusional disorder, especially the paranoid, schizoid and schizotypal varieties." Munro, *supra* 50, 56. Both Schizotypal Personality Disorder and Delusional Disorder may present with ideas of reference, the belief that "random events are of special significance." DSM-IV-TR §297.1. Delusional Disorder is distinguished from Schizotypal Personality Disorder primarily, although not exclusively, by the presence of false, fixed, nonbizarre delusions. Unlike Schizotypal Personality Disorder and Schizophrenia, there is no typical age of onset for Delusional Disorder. *Id.* Before making an Axis II diagnosis, such as a personality disorder, mental health experts are admonished to preclude the possibility that the individual's symptoms are explained by an Axis I diagnosis.

Because counsel failed to obtain medical records from Morva's immediate family members and conduct adequate interviews with family witnesses regarding medical issues, they failed to uncover numerous indications of mental health problems in Morva's family that would be important in determining whether Morva has an Axis I disorder. Morva's brother, Michael, reportedly behaved in some of the same odd ways that Morva did. JA-990-91. Michael's fixation on his dental problems and his belief in the supernatural may also rise to the level

of delusions. JA-1367-70, 372, 376, 1653-1739. *See also* Munro, *supra* 84 ("Other [somatic] delusional contents which have been reported include having an abnormal dental condition. . . ."). Michael has received treatment for mental health problems. JA-1378-79. Morva's father may well have suffered from mental health problems. JA-1013, 1360. Both his maternal grandmother and his maternal uncle were, at one point, diagnosed with schizophrenia, and his maternal great-grandfather spent time in a mental health facility. JA-1023, 1073.

Donna Schwarz-Watts, M.D., a forensic psychiatrist, interviewed and evaluated Mr. Morva on August 21, 2014. JA-2922. Dr. Schwartz-Watts also reviewed the family and social history compiled in state habeas and described above. JA-2925. Dr. Schwartz-Watts found, based on her evaluation and Mr. Morva's history, that he has delusional disorder, persecutory type. JA-2927. People with this type of delusional disorder believe that they are being mistreated in some way or that people are conspiring against them. Charles Sell, the petitioner in *Sell v. United States*, 539 U.S. 166 (2003), suffered from the same disorder. Equipped with a diagnosis of delusional disorder, a major mental illness and a DSM-IV-TR axis I disorder, and the family and social history and symptoms supporting the diagnosis, competent counsel would have been able to explain to the jurors how Morva's criminal actions were directly related to and a product of his mental illness--a circumstance far beyond his control

78

that diminishes his moral culpability.  *See, e.g., Boyde v. California,* 494 U.S. 370, 382 (1990) (There is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse"); *Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ("Evidence of mental disturbance . . . can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome").  In addition, rather than Morva's violence being the product of a depraved and evil mind, trial counsel could have had an explanation for the jury that Morva's mental illness was a but-for cause of the violence, reducing his moral culpability and providing a strong argument for life in prison rather than a death sentence. *See, e.g., The Relationship Between Delusions and Violence*, Coid et al, JAMA Psychiatry 2013;70(5):465-471 (finding that there was a strong correlation between persecutory delusional beliefs, anger and violence).

There is a reasonable probability that if all of the available family history, social history, and evidence of mental illness had been provided to Morva's trial experts and presented to a jury that the result would have been at least one juror would have voted to sentence Morva to life without the possibility of parole.

### C.  The state court's adjudication.

With regard to the family history, the state court denied relief in a single

79

paragraph:

> The Court holds that claim (VIII) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including Morva's exhibits, demonstrates that counsel conducted an exhaustive investigation and spoke with the witnesses upon whose affidavits Morva now relies. These affidavits contain vast amounts of negative information that shows Morva as self-absorbed, manipulative, aggressive, and uncaring. As such, testimony from these witnesses would have been "double-edged." *Lewis,* 274 Va. at 116, 645 S.E.2d at 505. Furthermore, Morva has not demonstrated what impact, if any, his parents' upbringings had on his actions. The information about his parents that Morva now provides does not concern Morva's personal background or history, or the circumstances of the offense, and does not mitigate Morva's actions. Thus, Morva has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

*Morva*, 741 S.E.2d at 789.

The state court's findings were an objectively unreasonable application of *Strickland* and its progeny and an unreasonable determination of the facts presented. Specifically, the state court reached these conclusions despite having no information available from trial counsel about the investigation they actually conducted, and each affiant supporting Morva's claim addressing counsel's complete failure to contact them or having limited contact only. Additionally, while some of the information may appear "double-edged," all of the "negative information" listed by the court was already extensively argued by the Commonwealth in sentencing. Thus, the aggravation side of the "double-edge"

80

was already before the jury while the mitigating side was never heard or considered.

Moreover, the state court "held" that Morva's evidence concerning his parents "does not concern Morva's personal background or history or the circumstances of the offense, and does not mitigate Morva's actions." *Morva*, 741 S.E.2d at 789. This finding is contrary to and an unreasonable application of *Strickland* and its progeny, as addressed below.

With respect to Claims V and IX of the state habeas petition, which alleged that counsel failed to adequately investigate and provide the available evidence to the mental health experts, the state court held simply that "Morva proffers no competent evidence to substantiate his claim that he suffered from a 'true mental illness,' or that providing additional information to the mental health experts who examined Morva in preparation for trial and sentencing would have changed the experts' conclusions." *Morva*, 741 S.E.2d at 790.

Morva was denied the appointment of experts and an evidentiary hearing. Thus he was given no opportunity in state habeas to proffer "competent evidence." Thus, the state court decision is entitled to no deference under the AEDPA and this claim must be removed *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (the procedures the state court used in determining that Panetti was competent to be executed were so deficient that they could not be

reconciled with any reasonable interpretation of due process as required under *Ford v. Wainwright*, 477 U.S. 399 (1986)). *See also Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) ("when a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA"). *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007) (same).

Even assuming deference were given to the state court's adjudication, under the AEDPA standards, the state court's decision denying relief on this claim was an unreasonable determination of the facts, an unreasonable application of *Strickland*, and contrary to all notions of due process as addressed in *Panetti* and *Ford*.

### D. The District Court's Holding.

The District Court agreed with the state court's finding that Morva's father's history "has nothing to do with this case and could not serve to mitigate Morva's crimes." JA-3036. The problem, however, is that this finding is an unreasonable application of *Strickland* and its progeny. *See, e.g., Porter*, 558 U.S. at 43-44 (decision was unreasonable under the AEDPA standards where the state court "discounted the evidence of [the defendant's] childhood abuse," which "may have particular salience" in a capital sentencing case like). Additionally, this finding is incredible in light of the state court's denial of funding for Morva to obtain expert

82

assistance and denial of an evidentiary hearing.  Only an expert could make, and would make, the connections between Morva's parents' history and the impact on Morva himself.  *See, e.g.,* JA-2047-2101 (Affidavit of Dale Watson, Ph.D.); JA-2235-45 (Affidavit of Leslie Lebowitz, Ph.D.).

Likewise, the District Court focused extensively on the testimony trial counsel did present at sentencing.  JA-3036-39.  In doing so, the District Court strayed from the issue at hand – the failure to adequately investigate and present mitigation.  The amount of evidence presented by counsel during sentencing says absolutely nothing about whether counsel conducted a reasonable investigation or had a reasonable strategy not to present additional mitigation evidence.  *See, e.g., Sears v. Upton*, 561 U.S. 945 (2010).  Counsel's effort to present some mitigation evidence -- in Sears's case seven mitigation witnesses— did not foreclose an inquiry into whether his investigation was deficient and whether the defendant was prejudiced.  *Id.* at 954.  Likewise, even though counsel's mitigation theory might have been reasonable in the abstract, *Strickland* required the court "to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory" was reasonable and whether it prejudiced the defendant.  *Id.* at 953.

The District Court's additional finding that the affidavits submitted in state habeas were simply cumulative and that "Dr. Cohen's report and testimony

factored these attributes of Morva's character into the psychiatric assessment developed in mitigation," JA-3039, is similarly misguided. As addressed above, trial counsel did not provide Dr. Cohen with any information from even the lay witnesses that had been interviewed in their investigation. The only information Dr. Cohen had was from Morva's mother and sister, JA-790, who had limited contact with Morva for at least five to ten years prior to these crimes. Indeed, Dr. Cohen had requested – and not received -- interviews of Morva's "associates" because the only information available to him from people who knew Morva in Blacksburg was "from police interviews (provided through discovery) and newspaper quotes" from others. JA-2957.

The District Court also erred in assuming that counsel had made a reasonable strategic decision to present only evidence "designed to paint Morva in a sympathetic light and support the expert psychological and psychiatric testimony." JA-3040. As addressed above, due to the state court's denial of an evidentiary hearing, there is no information available from trial counsel about the investigation they actually conducted, and each affiant supporting Morva's claim asserted counsel's complete failure to contact them or having limited contact only.

The issue here, which the District Court seems to have missed as the state court did, is the reasonableness of the investigation itself because a reasonable investigation is a necessary precursor to a determination of whether counsel's

84

strategy is reasonable. Specifically, in *Wiggins v. Smith*, in reviewing the assertion of ineffective assistance of counsel for failing to prepare and present mitigation evidence, the Court defined the preliminary issue as a determination of "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*." 539 U.S. at 523 (emphasis in original).

Only after a determination of whether counsel's investigation is reasonable can a court determine whether a trial strategy is reasonable. Specifically, counsel may forego presentation of available mitigation evidence only if counsel has a reasonable basis or strategy for doing so. In short, counsel can make a valid strategic decision only after counsel has fulfilled the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. *See also Wiggins*, 539 U.S. at 522.

Here, the District Court, like the state court, failed to analyze the preliminary question of the adequacy of the investigation. Instead, the District Court, like the state court, simply ignored the numerous affidavits Morva submitted and jumped to the unsupported conclusion that counsel's investigation was reasonable and that there was a reasonable strategic decision. That is an unreasonable determination of the facts that is directly contrary to Morva's affiants and no evidence at all was submitted from trial counsel or the Warden to contradict those affiants. *See, e.g.,*

85

*White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005) (where "counsel's investigation was . . .superficial," "the presumption of sound trial strategy founders . . . on the rocks of ignorance, as in *Wiggins*").

The District Court also erroneously faults Morva's mother and sister, for failing to provide Dr. Cohen with information about "the negative environment Morva asserts he experienced while growing up in the Morva household." JA-3041. In short, the District Court held: "Trial counsel cannot be faulted because Morva's family members did not report the circumstances of Morva's childhood." JA-3041. This finding is directly contradictory to Supreme Court case law. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (counsel's conduct deficient in failing to investigate and simply relying on the petitioner and his family who were "actively obstructive by sending counsel off on false leads").

The District Court also erred in rejecting this claim simply because "Dr. Cohen already had sufficient information to diagnose Morva with schizotypal personality disorder." JA-3043. The District Court then quotes extensively from Dr. Cohen's report. JA-3043-48 & 3051. Again, that finding misses the point – while Dr. Cohen may have had sufficient information to reach that conclusion, he did not have sufficient information to reach the Axis I diagnosis of delusional disorder, persecutory type, and the jury did not have sufficient mitigating evidence to support the finding of a mental illness.

Finally, the District Court rejects this diagnosis because it came only from the state habeas reports "from Drs. Dale G. Watson, Ph.D., and Leslie Lebowitz, Ph.D., . . . and from Dr. Donna Schwartz-Watts, M.D., filed in connection with the federal habeas petition." JA-3048. The court rejected these findings because "neither Dr. Watson nor Dr. Liebowtiz met Morva," JA-3048 n.17, and because "Dr. Schwartz-Watts' 2014 evaluation cannot be used as a basis to attack the adjudication of the state habeas claims," JA-3052. The District Court also found it significant that "Morva has made no showing that Dr. Schwartz-Watts' diagnosis of a delusional disorder in 2014 could have, or would have, been rendered by the trial experts in 2008 had they been presented with the evidence Morva claims was not adequately pursued." JA-3052.

There are, at least, two ways that these findings were improper. First, as is addressed above, Morva was denied the appointment of experts and an evidentiary hearing. Thus he was given no opportunity in state habeas to have Dr. Watson or Dr. Liebowtiz meet and evaluate Morva. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

Second, Morva was not and is not required to show that the pretrial court-appointed experts would have changed their conclusions. That is simply not the standard to determine prejudice and neither the Warden, the state court, nor the District Court offers any law to the contrary. The relevant standard can be found in

87

*Rompilla v. Beard*, 545 U.S. 374 (2005).  In *Rompilla*, the court found counsel ineffective for failing "to make reasonable efforts to obtain and review material that counsel [knew] the prosecution [would] probably rely on as evidence of aggravation at the sentencing phase of the trial," *id.* at 377, which would have led to significant mitigation.  The Court did not require a showing that the pre-trial mental health experts would have changed their opinions. After analyzing the evidence that was not discovered by trial counsel, the Court stated:

> The jury never heard any of this and neither did the mental health experts who examined Rompilla before trial.   While they found "nothing helpful to [Rompilla's] case," *Rompilla*, 554 Pa., at 385, 721 A.2d, at 790, their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of " 'red flags' " pointing up a need to test further.  355 F.3d, at 279 (Sloviter, J., dissenting).  When they tested, they found that Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." *Ibid.*   They also said that "Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense."  *Id.*, at 280 (Sloviter, J., dissenting).

*Id.* at 392.

At bottom, regardless of anything else, the standard is not whether the medical diagnosis would have been different if counsel had performed adequately, but whether, if counsel had performed adequately, there is a reasonably probability of a different result, *Strickland*, 466 U.S. at 694, or, in other words, whether the available but unpresented mitigation evidence "'might well have influenced the

jury's appraisal' of . . . culpability," *Rompilla*, 545 U.S. at 393.

## CONCLUSION

For the reasons stated above, Mr. Morva respectfully requests a COA on Issues II and III, and requests that the judgment of the district court be reversed and the matter be remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Because of the significant issues presented, Mr. Morva respectfully requests that he be granted oral argument.

Respectfully submitted,

_____/s/_____
Jonathan P. Sheldon

Sheldon, Flood & Haywood, PLC
Counsel for William Morva
10621 Jones Street, Suite 301A
Fairfax, VA 22030
Office (703) 691-8410
Fax (703) 251-0757
JSheldon@SFHdefense.com

Teresa L. Norris
Blume Norris & Franklin-Best, LLC
Counsel for William Morva
900 Elmwood Avenue, Suite 101
Columbia, SC 29201
Office (803) 765-1044
Fax (803) 765-1143
teresa@blumelaw.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 21,579 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman.

_____/s/_____
Jonathan P. Sheldon

## CERTIFICATE OF SERVICE

I certify that on July 23, 2015, a copy of the foregoing Opening Brief was filed electronically with the Clerk of the Court using the CM/ECF filing system which will send notification of such filing to Warden's counsel, Matthew Dullaghan, Assistant Attorney General, 900 East Main Street, Sixth Floor, Richmond, Virginia 23219, at mdullaghan@oag.state.va.us.

_____/s/_____
Jonathan P. Sheldon
Sheldon, Flood & Haywood, PLC
Counsel for William Morva
10621 Jones Street, Suite 301A
Fairfax, VA 22030
Office (703) 691-8410
Fax (703) 251-0757
JSheldon@SFHdefense.com

91